# EXHIBIT "A"

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**FEBRUARY 2021**

**000529**

E-Filing Number: 2102009430

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| KEYSTONE PF ACQUISITION, LLC | AFFILIATED FM INSURANCE COMPANY |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 2010 STATE ROAD<br>CAMP HILL PA 17011 | P.O. BOX 7500<br>JOHNSTON RI 02919 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 1 | 1 | ☒ Complaint  ☐ Petition Action  ☐ Notice of Appeal<br>☐ Writ of Summons  ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | |
|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☐ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☒ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

CASE TYPE AND CODE

1D - INSURANCE, DECLARATORY JUDGMNT

STATUTORY BASIS FOR CAUSE OF ACTION

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

**FILED
PRO PROTHY**

FEB **05** 2021

**G. IMPERATO**

IS CASE SUBJECT TO
COORDINATION ORDER?

YES          NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: KEYSTONE PF ACQUISITION, LLC

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| JOHN S. STAPLETON | LEVAN MUHIC STAPLETON LLC<br>ONE LIBERTY PLACE |
| PHONE NUMBER: (215)561-1500 | FAX NUMBER: none entered | 1650 MARKET STREE, SUITE 3600<br>PHILADELPHIA PA 19103 |
| SUPREME COURT IDENTIFICATION NO.: 200872 | E-MAIL ADDRESS: jstapleton@levanmuhic.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY: *JOHN STAPLETON* | DATE SUBMITTED: Friday, February 05, 2021, 10:51 am |

FINAL COPY (Approved by the Prothonotary Clerk)

**LeVAN MUHIC STAPLETON LLC**
John S. Stapleton, Pa. I.D. 200872
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
215.561.1500
jstapleton@levanmuhic.com

**KING & SPALDING LLP**
Shelby S. Guilbert, Jr. (*pro hac* to be filed)
Georgia Bar No. 315101
Nicholas G. Hill (*pro hac* to be filed)
Georgia Bar No. 744482
Amy Dehnel (*pro hac* to be filed)
Georgia Bar No. 707836
1180 Peachtree Street NE
Atlanta, GA 30309
404-572-4600 (Phone)
sguilbert@kslaw.com
nhill@kslaw.com
adehnel@kslaw.com

*Attorneys for Plaintiff*

This is NOT an Arbitration Case

*Filed and Attested by the Office of Judicial Records 05 FEB 2021 10:51 am G. IMPERATO*

| | |
|---|---|
| Keystone PF Acquisition, LLC, <br> 2010 State Road <br> Camp Hill, PA 17011, <br><br>       Plaintiff, <br><br>    v. <br><br> AFFILIATED FM INSURANCE COMPANY, <br> P.O. Box 7500 <br> Johnston, RI 02919, <br><br>       Defendant. | COURT OF COMMON PLEAS <br> PHILADELPHIA COUNTY <br><br> COMMERCE PROGRAM <br><br> February Term, 2021 <br> No. _____ <br><br> **JURY TRIAL DEMANDED** |

**NOTICE TO DEFEND**

| **NOTICE** | **AVISO** |
|---|---|
| **You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or** | **Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a** |

objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

**Philadelphia Bar Association Lawyer Referral and Information Service**
**One Reading Center**
**Philadelphia, Pennsylvania 19107**
**(215) 238-6333**
**TTY (215) 451-6197**

la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

*Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

**Asociacion De Licenciados De Filadelfia Servicio De Referencia E Informacion Legal**
**One Reading Center**
**Filadelfia, Pennsylvania 19107**
**(215) 238-6333**
**TTY (215) 451-6197**

Case ID: 210200529

**LeVAN MUHIC STAPLETON LLC**
John S. Stapleton, Pa. I.D. 200872
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
215.561.1500
jstapleton@levanmuhic.com

**KING & SPALDING LLP**
Shelby S. Guilbert, Jr. (*pro hac* to be filed)
Georgia Bar No. 315101
Nicholas G. Hill (*pro hac* to be filed)
Georgia Bar No. 744482
Amy Dehnel (*pro hac* to be filed)
Georgia Bar No. 707836
1180 Peachtree Street NE
Atlanta, GA 30309
404-572-4600 (Phone)
sguilbert@kslaw.com
nhill@kslaw.com
adehnel@kslaw.com

*Attorneys for Plaintiff*

| | |
|---|---|
| Keystone PF Acquisition, LLC,<br>2010 State Road<br>Camp Hill, PA 17011,<br><br>                              Plaintiff,<br><br>            v.<br><br>AFFILIATED FM INSURANCE COMPANY,<br>P.O. Box 7500<br>Johnston, RI 02919,<br><br>                              Defendant. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>COMMERCE PROGRAM<br><br>February Term, 2021<br>No. _____<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT – CIVIL ACTION**

Case ID: 210200529

## INTRODUCTION

1.     This is an action for damages arising out of Defendant Affiliated FM Insurance Company's ("AFM") bad faith refusal to reimburse Plaintiff Keystone PF Acquisition, LLC ("National Fitness Partners") under an AFM "all risk policy" for tens of millions of dollars in business interruption losses caused by the novel coronavirus.

2.     As the Pennsylvania Supreme Court declared in the early stages of the pandemic: "The COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions." *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889 (Pa. 2020).  The omnipresence of the virus throughout the United States, the dangerous conditions it creates when virus droplets spread in indoor environments, and the ensuing government stay at home orders issued by state and local authorities, have stripped many businesses of the ability to use their properties for income generating purposes.  This is particularly true for gyms and fitness centers, whose business models depend on the ability to welcome customers who want to exercise indoors in a communal environment.

3.     Plaintiff Keystone PF Acquisition, LLC ("National Fitness Partners") operates approximately eighty (80) Planet Fitness branded fitness centers in Pennsylvania, Delaware, North Carolina, and South Carolina.  The COVID-19 pandemic has prevented National Fitness Partners from operating its properties for their intended purpose: welcoming members to work out, run on treadmills, lift weights, take fitness classes, and use Planet Fitness's custom-built locker rooms, showers, and restrooms.

4.     While some government restrictions that were imposed on fitness centers last year were lifted, new restrictions have been imposed in some locations due to a renewed rise in cases of COVID-19.  Additionally, as states continue to report record numbers of COVID-19 cases,

Case ID: 210200529

restrictions could be reimposed in other locations, which may require National Fitness Partners to again completely shutter a substantial number of its facilities.

5.      National Fitness Partners has attempted to mitigate its losses by opening certain locations with severe capacity restrictions and other protective measures at great expense, and it has lost tens of millions of dollars because of the damage caused when physical virus droplets spread inside its facilities, onto its equipment, and within the surrounding communities its fitness centers serve.  National Fitness Partners will likely incur additional significant losses as the virus spreads in record numbers throughout the winter and new governmental orders restrict or prohibit access to gyms and fitness centers.

6.      Before the COVID-19 pandemic hit, National Fitness Partners bought one of the broadest business interruption insurance policies available in the market from Defendant AFM to protect itself against the risk of business interruption losses resulting from natural disasters and other perils.  AFM self-describes its proVision policy form as "broad all-risk coverage."[1]  AFM's all risk "ProVision" insurance policy insures National Fitness Partners against "ALL RISKS OF PHYSICAL LOSS OR DAMAGE," except those specifically excluded (the "Policy").  (*See* Exhibit 1.)  This Policy also guarantees coverage for "Business Interruption loss" resulting from physical loss or damage, as well as coverage for extra expenses that National Fitness Partners incurs to mitigate business interruption losses.

7.      Unlike business interruption policies sold by other insurance companies, the AFM Policy does not exclude coverage for business interruption losses resulting from a virus or a

---

[1]  *See* AFM, PROVISION POLICY, *available at* https://www.affiliatedfm.com/property-coverage/provision-policy (last visited Nov. 13, 2020).

Case ID: 210200529

pandemic, even though the insurance industry developed exclusions designed to limit exposure to communicable diseases nearly two decades ago in the wake of the 2003 SARS epidemic.

8.     In the wake of the COVID-19 pandemic, some reinsurers and insurers have added specific COVID-19 exclusions to their policies to clearly and unmistakably exclude coverage for risks arising out of the COVID-19 pandemic, but the AFM policy has no such exclusions.

9.     Notwithstanding the extremely broad coverage provided by the AFM policy, and the lack of a virus exclusion applicable to business interruption losses, AFM denied coverage for National Fitness Partners' insurance claim for two reasons.  First, AFM took the wrongful position that the presence of the coronavirus in fitness centers and the surrounding community cannot cause physical loss or damage to property.  Second, AFM also denied coverage based on its wrongful determination that a contamination exclusion in the Policy bars coverage, even though AFM's contamination exclusion on its face does not apply to business interruption losses.

10.    AFM's coverage denial cannot be reconciled with AFM's separate promise in the Policy to provide coverage for losses resulting from communicable disease, which confirms that a virus can cause physical loss or damage to property.

11.    Moreover, AFM denied coverage for National Fitness Partners' losses without conducting a proper investigation of those losses, in keeping with AFM's corporate strategy of issuing blanket coverage denials for COVID-19 related business interruption claims without conducting proper claims investigations.  To make matters worse, AFM made misrepresentations about the scope of the contamination exclusion in its coverage denial letters, in violation of Pennsylvania law.

12.    Through its actions in denying National Fitness Partners' business interruption claim for COVID-19 related losses, AFM has breached its promise to provide coverage for

Case ID: 210200529

National Fitness Partners' losses, and in doing so, AFM has violated its obligation to conduct a reasonable, good faith investigation of its policyholder's insurance claim. Accordingly, National Fitness Partners seeks damages for AFM's breach of the insurance policy, as well as damages for AFM's bad faith conduct in handling this claim.

## ALLEGATIONS

## PARTIES

13.     Plaintiff Keystone PF Acquisition, LLC ("National Fitness Partners") is a Delaware limited liability company with its principal place of business in Camp Hill, Pennsylvania.

14.     Defendant Affiliated FM Insurance Company is incorporated under the laws of Rhode Island, with a principal place of business in Johnston, Rhode Island. AFM is authorized to do business in and issue insurance policies in the Commonwealth of Pennsylvania and the States of Delaware, North Carolina, and South Carolina.

## JURISDICTION & VENUE

15.     This Court has subject matter jurisdiction under 42 Pa.C.S. § 911(a), and there is no federal subject matter jurisdiction under 28 U.S.C. § 1332 because the parties lack complete diversity.

16.     An investor in a limited partnership of which National Fitness Partners is an indirect subsidiary is a non-profit corporation incorporated in Rhode Island and has a principal place of business in Rhode Island.

17.     This Court has personal jurisdiction over AFM under Pennsylvania's long-arm statute, 42 Pa.C.S. § 5322, because AFM is authorized to do business in the Commonwealth of Pennsylvania and issued an insurance policy to a company that conducts business and owns property in the Commonwealth.

Case ID: 210200529

18.     Venue is proper in this Court under 231 Pa. Code § 2179(b) because some of the insured property upon which National Fitness Partners brings this action is located in Philadelphia County.

## FACTUAL BACKGROUND

A.     **National Fitness Partners' Operations**

19.     National Fitness Partners owns and operates approximately eighty (80) Planet Fitness locations in Pennsylvania, Delaware, North Carolina, and South Carolina.

20.     Through its Planet Fitness locations, National Fitness Partners aims to enhance people's lives by providing a high-quality fitness experience in a welcoming, non-intimidating environment, which Planet Fitness calls the "Judgment Free Zone."

21.     National Fitness Partners' Planet Fitness locations are typically 20,000 square feet in size, and contain a large selection of high-quality, purple, and yellow Planet Fitness-branded cardio, circuit-, and weight-training equipment, and friendly staff trainers who offer unlimited free fitness instruction to all its members in small groups.

22.     Central to the Planet Fitness business model is the creation of a community atmosphere—a place where you do not need to be fit before joining and where progress toward achieving your fitness goals (big or small) is supported and applauded by its staff and fellow members.

23.     Accordingly, National Fitness Partners' business depends on the ability to operate a physical space where its members can gather together and exercise indoors.

Case ID: 210200529

B.    **National Fitness Partners' Insurance Policy**

24.    National Fitness Partners purchased the Policy—an "all risk" "proVision"® policy (Policy No. IA202)—from Defendant AFM.  The Policy provides up to $100,000,000 in insurance coverage.  (Policy, at 1 of 10).

25.    AFM drafted the Policy.

26.    The AFM Policy is written on AFM's "proVision 4100 Policy form."

27.    The Policy identifies as the Named Insured "Keystone PF Acquisition, LLC, and its wholly or majority owned subsidiaries and any interest which may now exist or hereinafter be created or acquired which are owned, controlled or operated by any one or more of those named insureds."  (*Id.*, at 1 of 10).

28.    The Policy contains a "Location Schedule" that identifies National Fitness Partners' Planet Fitness locations as insured locations.  These insured locations are referred to as "described locations" in the Policy.

29.    The premium that AFM charged for the Policy was based on the nature of National Fitness Partners' business, which as stated above, is operating physical locations where individuals can exercise together indoors.

30.    Through the Policy, AFM promised to insure "property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded." (*Id.*). Thus, all risks not otherwise excluded are covered causes of loss.

31.    The Policy does not define the words "physical loss or damage."

32.    Likewise, the Policy does not define the words "property damage."

33.    The Policy also contains numerous additional coverages in addition to all risks property coverage.

Case ID: 210200529

34.     For example, AFM promised to provide coverage for Business Interruption loss as follows:

> This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:
>
> 1.   To property as described elsewhere in this Policy and not otherwise excluded by this Policy;
>
> 2.   Used by the Insured;
>
> 3.   While at a location or while in transit as provided by this Policy; and
>
> 4.   During the Period of Liability as described elsewhere in this Policy.
>
> This Policy also covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss is reduced.

(*Id.*, at 19 of 44).

35.     The Business Interruption Coverage section of the Policy also covers "recoverable Extra Expense loss," which includes "the reasonable and necessary extra expense incurred by the Insured" during the "Period of Liability" to "[t]emporarily continue as close to normal the conduct of the Insured's business."  (*Id.*, at 22 of 44).

36.     In addition, the Policy contains numerous Business Interruption Coverage extensions that provide additional coverage when the coronavirus causes losses away from the locations covered under the Policy.

37.     The policy provides up to $100,000 in Attraction Property Coverage, which covers the Business Interruption Coverage loss incurred directly resulting from physical loss of the type insured to property of the type insured that attracts business to a "described location" and is within one mile of the "described location."  (*Id.*, at 24 of 44).

Case ID: 210200529

38.     The Policy also provides up to 30 days of Civil or Military Authority Coverage, which provides as follows: "This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a location provided such order is the direct result of physical damage of the type insured at a location or within five (5) statute miles of it." (*Id.*, at 24 of 44).

39.     The Policy also provides up to $100,000 in coverage for "Communicable Disease – Business Interruption," stating as follows:

> If a described location owned, leased or rented by the Insured has the actual not suspected presence of communicable disease and access to such described location is limited, restricted or prohibited by:
>
> a) An order of an authorized governmental agency regulating such presence of communicable disease; or
>
> b) A decision of an Officer of the Insured as a result of such presence of communicable disease,
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such described location with such presence of communicable disease.
>
> This coverage is subject to the Qualifying Period in the Declarations section of this Policy.
>
> Communicable Disease - Business Interruption Exclusions: As respects Communicable Disease - Business Interruption, the following additional exclusions apply:

(*Id.*, at 25 of 44).

40.     "Communicable Disease" is defined in the Policy as, among other things, "disease which is: . . . [t]ransmissable from human to human by direct or indirect contact with an affected individual or the individual's discharges." (*Id.*, at 42 of 44).

41.     The Policy also provides Ingress/Egress coverage, which "covers the Business Interruption Coverage loss incurred by the Insured due to the necessary interruption of the

Case ID: 210200529

Insured's business when ingress to or egress from a described location(s) is physically prevented, either partially or totally, as a direct result of physical loss or damage of the type insured to property of the type insured whether or not at a described location."  (*Id.*, at 27 of 44).

42.     "Location" is defined as "a location described in the Insurance Provided clause of the Declarations section or included as Newly Acquired Property or Unnamed Property coverages," and includes all Planet Fitness locations that is the subject of this Complaint.  (*Id.*, at 1-2 of 10).

43.     When National Fitness Partners purchased the Policy from AFM, National Fitness Partners expected the Policy—which provides coverage for "all risks" not specifically excluded— to insure it against a variety of losses, including business income losses at its Planet Fitness locations caused by the presence of a virus or the shutdown of its Planet Fitness locations due to a pandemic in close proximity to its businesses.

44.     The Policy contains three different groups of exclusions: Group I, Group II, and Group III.

45.     The exclusions limit coverage provided elsewhere in the Policy.

46.     Some of the exclusions apply to "loss or damage" caused by specified causes or events.

47.     Some exclusions in the Policy do not apply to "loss."

48.     Some exclusions in the Policy do not apply to "damage."

49.     None of the exclusions contained in the policy bar coverage for business interruption losses resulting from the novel coronavirus, COVID-19, or natural disasters like the COVID-19 pandemic.

Case ID: 210200529

50.     After the SARS epidemic of 2003, the Insurance Services Office ("ISO") promulgated a form virus exclusion ("CP 01 40 07 06") for use in commercial property policies. That exclusion states as follows: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

51.     In promulgating CP 01 40 07 06, the ISO noted that although there are exclusions that purport to encompass contamination and in fact use the term contaminant in addition to other terminology, losses arising from viral and bacterial contamination were specific types of exposure warranted particular attention.

52.     AFM did not include CP 01 40 07 06 in its Policy.

53.     The AFM Policy does not include a virus or communicable disease exclusion that applies to business interruption losses arising out of the COVID-19 pandemic.

## C.     The COVID-19 Pandemic, the Spread of the Virus, and the Ensuing Government Shutdown Orders

54.     On March 11, 2020, the World Health Organization ("WHO") declared that the emerging threat from the novel coronavirus, which causes COVID-19, constituted a global pandemic.

55.     The Center for Disease Control ("CDC") and WHO have explained that COVID-19 spreads through physical droplets and particles released by an infected person through talking, sneezing, coughing, or even breathing.  Evidence shows these particles and droplets are airborne, can travel more than six feet, and can remain suspended in the air for hours.

56.     Research has also shown that the novel coronavirus is a physical substance that may live on hard surfaces for hours or days, rendering any surface exposed to an infected person potentially unsafe and dangerous for continued use.

Case ID: 210200529

57.     Thus, the presence of the novel coronavirus causes a physical alteration of the insured property, rendering the insured property unsafe and unusable.

58.     Research also shows that the novel coronavirus can be pulled into air circulation systems.  This creates particular risks for a business that operates indoors.  Indeed, the CDC has published a study concluding that an outbreak among diners at an air-conditioned restaurant was caused by "droplet transmission . . . prompted by air-conditioned ventilation."  The same concerns exist for National Fitness Partners, a business that operates indoor fitness facilities.

59.     A recent research paper in Nature identifies fitness facilities as one of the types of businesses most likely to lead to the spread of COVID-19 in the absence of stay-at-home orders or capacity constraints.  *See* Chang, Serina, et al., Mobility Network Models of COVID-19 Explain Inequities and Inform Reopening, NATURE (preview publ'd online, Nov. 10, 2020), *available at* https://doi.org/10.1038/s41586-020-2923-3.

60.     Planet Fitness's members come to Planet Fitness's facilities to exercise, which increases people's heartrates and causes people to breathe harder.

61.     Harder breathing increases the radius of aerosolized coronavirus droplets expelled by individuals, which is the main way in which the novel coronavirus spreads.

62.     Thus, the physical presence of the novel coronavirus in the air at a fitness facility renders the property uninhabitable and/or unfit for its normal use.  While some of National Fitness Partners' centers have been able to reopen since the onset of the pandemic, they have only been able to do so after implementing significant capacity restrictions, expensive cleaning regimens, and requiring, among other things, that customers wear masks to limit the spread of the virus from individuals to the air and surfaces inside Planet Fitness locations.

Case ID: 210200529

63.     Research also indicates that people contract COVID-19 through "community spread," a phenomenon in which the virus easily spreads throughout a geographic area, and the persons infected are not able to pinpoint where, when, or from whom they contracted the disease.

64.     This community spread has resulted in COVID-19 being present throughout the United States, including throughout the communities in Pennsylvania, Delaware, North Carolina, and South Carolina in which National Fitness Partners operates its Planet Fitness franchises.

65.     In response to the growing threat from the pandemic and high degree of contagiousness of COVID-19, the Pennsylvania, Delaware, North Carolina, and South Carolina governments issued orders requiring the closure of, among other things, gyms and fitness centers. Although some of the restrictions imposed by those orders expired permitting National Fitness Partners to operate in a limited capacity, the rise of cases during the fall and winter has led some state and local governments to reimpose restrictions, including the full closure of gyms and fitness centers. As COVID-19 continues to spread at a record pace, stricter restrictions in other locations may also be imposed.

66.     More specifically, on or around March 6, 2020, Governor Tom Wolf of Pennsylvania "proclaimed the existence of a disaster emergency throughout the Commonwealth," and subsequently encouraged non-life-sustaining businesses, including gyms, to close.

67.     On or around March 19, 2020, Governor Wolf cited his authority to "control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein" and issued an order mandating: "No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public." Gyms and fitness centers were not considered to be

Case ID: 210200529

"a life sustaining business" under the terms of the order.  Regarding his executive order, Governor

Wolf stated, "This virus is an invisible danger that could be present everywhere."

68.    Additionally, the Pennsylvania Supreme Court recently explained that the COVID-

19 pandemic qualifies as a "natural disaster" under Pennsylvania's Emergency Code because, like

the disasters specifically enumerated in the definition of "natural disaster" in the code—*e.g.*,

hurricane, tornado, explosion—the COVID-19 pandemic causes "substantial damage to property,

hardship, suffering, or possible loss of life." *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 888-

89 (Pa. 2020).

69.    On or around March 13, 2020, Governor Henry McMaster of South Carolina

declared a State of Emergency in response to the "determination that COVID-19 posed an

imminent public health emergency for the State of South Carolina."

70.    On March 23, 2020 Governor McMaster issued Executive Order No. 2020-13

"authorizing and directing law enforcement officers of the State, or any political subdivisions

thereof, to, *inter alia*, prohibit or disperse any congregation or gathering of people, unless

authorized or in their homes, in groups of three (3) or more people, if any such law enforcement

official determines, in their discretion, that any such congregation or gathering of people powers,

or could pose, a threat to public health."

71.    On March 31, 2020, Governor McMaster issued Executive Order No. 2020-17,

which stated, in part "I hereby order and direct that effective Wednesday, April 1, 2020, at 5:00

p.m., the following 'non-essential' businesses, venues, facilities, services and activities shall be

closed to non-employees and shall not be open for access or use by the public—to include

members, if access or use is ordinarily restricted to or based on membership—or shall not take

place, as applicable[.]"  The list of "non-essential" businesses included "[f]itness and exercise

14

centers and commercial gyms[,]" "[g]roup exercise facilities, to include yoga, barre, and spin studios or facilities[,]" and "[a]ctivities that require the use of shared sporting apparatus and equipment[.]"

72.     The Order states, "[t]he health, welfare, and safety of the lives and property of the people are beyond question matters of public concern, and reasonable regulations and laws designed to preserve and protect the same are clearly contained in the police power inherent in the sovereign."

73.     The Order draws upon the authority of the governor during a state of emergency to, among other things, "order and direct any person or group of persons to do any act which would in his opinion prevent or minimize danger to life, limb or property, or prevent a breach of the peace" and "order any person or group of persons to refrain from doing any act or thing which would, in his opinion, endanger life, limb or property."

74.     The Order further provides: "This Order is effective immediately and shall remain in effect for the duration of the State of Emergency unless otherwise modified, amended, or rescinded by subsequent Order. Further proclamations, orders, and directives deemed necessary to ensure the fullest possible ***protection of life and property*** during this State of Emergency shall be issued orally by the undersigned and thereafter reduced to writing and published for dissemination within the succeeding 24-hour period."  (emphasis added).

75.     On March 10, 2020, Governor Cooper of North Carolina declared a State of Emergency "to coordinate the State's response and protective actions to address the Coronavirus Disease 2019 (COVID-19) public health emergency and to provide for the health, safety, and welfare of residence and visitors located in North Carolina."

Case ID: 210200529

76.     On March 27, 2020, Governor Cooper issued Executive Order No. 121, which stated, in part "non-essential business and operations must cease."  The Order further provided "All businesses and operations in the State, except COVID-19 Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below."  Gyms and fitness centers were not on the list of COVID-19 Essential Businesses and Operations.

77.     In issuing this Order, Governor Cooper drew upon his authority to "to prohibit and restrict activities which may be reasonably necessary to maintain order and *protect lives and property* during a state of emergency."  (emphasis added).

78.     As set forth in the order, Governor Cooper issued Executive Order No. 121 in part because "the undersigned has determined that local control of the emergency is insufficient to assure adequate protection *for lives and property* of North Carolinians."  (emphasis added).

79.     As set forth in the order, Governor Cooper also issued Executive Order No. 121 because "the area in which the emergency exists spreads across local jurisdictional boundaries and the legal control measures of the jurisdictions are conflicting or uncoordinated to the extent that efforts to *protect life and property* are, or unquestionably will be, severely hampered," among other reasons.  (emphasis added).

80.     On March 12, 2020, Governor John Carney of Delaware issued a State of Emergency "due to the public health threat of COVID-19."

81.     On March 16, 2020, Governor Carney issued the Second Amended Modification to the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat, mandating that, "Effective March 19, 2020 at 8:00 a.m. EDT, owners and operators of bowling

Case ID: 210200529

alleys, concert events, movie theaters, sports facilities, fitness centers, and health spas shall cease operations."

82.     In the months following the initial orders that closed gyms and fitness center in each state, these closures were extended multiple times and other restrictions placed on gyms and fitness centers.

83.     In addition, many counties and municipalities where National Fitness Partners operates have issued overlapping orders and restrictions on National Fitness Partners' ability to operate its locations due to the harmful conditions created by the spread of the coronavirus, particularly inside indoor environments.

84.     And even though some gyms and fitness centers have recently been able to reopen, they still face occupancy and other restrictions impairing their business operations.

85.     In re-opening certain locations at reduced capacity, National Fitness Partners has incurred substantial extra expenses, including the installation of hand sanitizer locations, touchless check-in stations, and cleaning stations, additional cleaning, and additional training for National Fitness Partners employees.

86.     New COVID-19 cases have risen across the country in recent months, reaching record levels of more than 200,000 new cases per day by the end of last year.  To combat this accelerating spread of the virus, some state and local governments reimposed stricter restrictions, including fully closing gyms and fitness centers, in some locations where National Fitness Partners had previously reopened its gyms and fitness centers after enacting substantial modifications.  As health experts have warned that cases will continue to rise throughout the winter, restrictions in other locations may follow.

Case ID: 210200529

87.     Specifically, on November 20, 2020, Mayor Jim Kenney of Philadelphia issued an "Emergency Order Concerning Additional Limitations on Visiting, Gatherings, Events and Businesses For Fall/Winter 2020-21, Establishing Additional Safety Measures to Prevent the Spread of the 2019 Novel Coronavirus (COVID-19) and Continuing to Advise that Philadelphians Are Safer at Home," in response to "a recent, significant uptick in percent positivity among those tested for COVID-19."   The Order said that "[t]o the extent any aspect of this Order is more restrictive than any such previous order or requirement, or in the event of a conflict between any such orders and this Order, this Order controls."   The Order specifically applied to fitness facilities like the Planet Fitness locations that National Fitness Partners operates: "Gyms and all other indoor facilities for physical exercise and training are prohibited from operating."

88.     The Order provided that it would remain in effect until "the end of January 1, 2021, unless otherwise rescinded, superseded, or amended by further Order."

89.     On December 20, 2020, Mayor Kenney extended the Order until January 15, 2021, but allowed gyms and indoor exercise facilities to resume operations, albeit with significant restrictions, on January 4, 2021.

90.     On December 10, 2020, Governor Carney issued a "Fourth Revision to the Twenty-Seventh Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat" effective December 13, 2020, stating that "Delaware continues to see an increase in new daily COVID-19 cases and Delaware's COVID-19 related hospitalizations and COVID-19 Intensive Care Unit (ICU) census have more than doubled over the past four weeks." The Revision said that it "shall in no way modify, alter or amend the remaining terms of the Omnibus Modification, all of which shall remain in full force."   The Revision specifically applied to limit certain fitness operations, such as at the Planet Fitness locations that National Fitness

Case ID: 210200529

Partners operates in Delaware: "Group exercise classes are limited to a maximum of ten (10) individuals (excluding staff)."

91.     The Revision provided that it would remain in effect "until January 11, 2021, unless expressly extended."

92.     On January 8, 2021, Governor Carney issued a "Fifth Revision to the Twenty-Seventh Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat" effective January 11, 2021, stating that "Delaware continues to see an increase in new daily COVID-19 cases and in the past week has had the highest daily case rate and highest number of hospitalizations to date."  The Revision said that it "shall in no way modify, alter or amend the remaining terms of the Omnibus Modification, all of which shall remain in full force."

93.     Governor Carney's Revision continues to apply "until further notice."

94.     On December 12, 2020, Governor Wolf issued an "Order of the Governor of the Commonwealth of Pennsylvania Directing Limited-Time Mitigation," completely closing many businesses throughout Pennsylvania because "the Commonwealth is now recording daily COVID-19 cases and hospitalizations in greater numbers than any other time during this pandemic."  The Order "suspends and supersedes any provisions of [the Governor's] prior Orders and Advisories that are in conflict with its requirements."  The Order specifically applies to fitness facilities like the Planet Fitness locations that National Fitness Partners operates in Pennsylvania: "Indoor operations at gyms and fitness facilities are prohibited."

95.     The Order remained in effect until "8:00 a.m. on January 4, 2021."

Case ID: 210200529

**D.**    **National Fitness Partners Incurred Losses Covered Under the Policy**

96.    The novel coronavirus that causes COVID-19 is a physical, tangible substance that infects the air and surfaces.

97.    Every Planet Fitness location that National Fitness Partners owns and operates has suffered direct physical loss or damage due to the spread and presence of the novel coronavirus.

98.    Since the onset of the COVID-19 pandemic, National Fitness Partners has not been able to operate its insured premises for their normal and intended purpose due to the physical presence of the novel coronavirus.

99.    National Fitness Partners has specific knowledge of twenty-two (22) National Fitness Partners employees at nearly twenty (20) different locations who have tested positive for COVID-19 since March. These employees almost certainly physically carried the virus to National Fitness Partners' insured locations.

100.    Moreover, National Fitness Partners has received calls from members who notified National Fitness Partners that they have contracted COVID-19 and, therefore, likely brought the novel coronavirus that causes COVID-19 to National Fitness Partners' fitness facilities.

101.    These known examples of COVID-19 positive individuals at National Fitness Partners' insured locations exemplify the concern that necessitated National Fitness Partners to close its insured locations. And, the asymptomatic members and/or employees who unknowingly had COVID-19 and did not know they were contagious also almost certainly brought the novel coronavirus to National Fitness Partners' fitness facilities.

102.    Indeed, there are likely instances where the novel coronavirus was physically present at National Fitness Partners' insured premises, but the individual infected with COVID-19

Case ID: 210200529

was pre-symptomatic.  However, during the virus's incubation period infected persons can still be contagious and transmit the virus.

103.    Health officials, including at the CDC and in the states in which National Fitness Partners operates, have expressed concern due to rapidly increasing case counts that "community spread" of COVID-19—where the illness is being transmitted through unknown sources, not from known areas of infection—is occurring.

104.    The rampant community spread of the virus and the more than 2 million *confirmed* cases of COVID-19 in the four states in which National Fitness Partners operates—approximately 855,000 in Pennsylvania; 770,000 in North Carolina; 450,000 in South Carolina; and 80,000 in Delaware—renders it virtually certain that the novel coronavirus was physically present at all of National Fitness Partners' insured locations, not to mention the surrounding communities that National Fitness Partners serves.

105.    The prevalence of the virus throughout the communities in which National Fitness Partners operates also resulted in direct physical loss or damage to property within five (5) miles of each National Fitness Partners location, resulting in governmental orders issued in each state in which National Fitness Partners operates that prohibited access to all of the National Fitness Partners fitness facilities.

106.    The presence of the novel coronavirus at National Fitness Partners' fitness facilities—including physically present on hard surfaces and in the air—rendered the facilities unfit for occupancy or use and prevented National Fitness Partners from conducting normal business operations at its insured premises.

107.    Likewise, the government orders that prohibited and continue to prohibit access to the insured premises due to the physical loss or damage to property caused by the presence of the

Case ID: 210200529

novel coronavirus within five (5) miles of the insured locations also rendered the fitness facilities unfit for occupancy or use and prevented National Fitness Partners from conducting normal business operations at its insured premises.

108.    Thus, the novel coronavirus has stripped National Fitness Partners of the ability to safely operate its gyms for revenue producing activities and has required National Fitness Partners to freeze hundreds-of-thousands of memberships because its members were unable to access the premises.

109.    Due to the physical presence of the novel coronavirus at National Fitness Partners' insured premises, the community spread of the virus, and government closure orders issued due to physical loss and damage caused by the presence of the novel coronavirus in the local communities, National Fitness Partners closed all of its fitness facilities between March 13, 2020 and March 17, 2020.

110.    National Fitness Partners' inability to operate its Planet Fitness locations because of the COVID-19 pandemic constitutes a physical loss of property.

111.    During the closures, National Fitness Partners froze all memberships, resulting in millions of dollars of lost revenues.  National Fitness Partners also lost the ability to derive in-facility revenue from the use of its property.

112.    Notwithstanding the dangerous conditions created by the spread of the novel coronavirus, and in an effort to mitigate its losses, National Fitness Partners worked diligently with safety teams and legal teams to reopen its fitness facilities.

113.    National Fitness Partners has invested and continues to invest significant sums of money into cleaning, testing, personal protective equipment ("PPE"), and other remedial measures that have allowed it to reopen its fitness facilities in a limited capacity.

Case ID: 210200529

114.    On a location-by-location basis, National Fitness Partners gradually reopened each of its facilities between May 21, 2020 (when it reopened two (2) facilities) and September 1, 2020 (when it reopened twenty-six (26) facilities) based on local conditions and application laws and regulations; however, its fitness facilities continue to operate at a limited capacity.

115.    Due to a rise of COVID-19 cases during the fall and early winter leading to new governmental orders, National Fitness Partners closed fourteen (14) locations and froze nearly 100,000 memberships in Pennsylvania in December 2020 until early January 2021.  Although the Philadelphia order allowed gyms and indoor fitness centers to reopen with significant restrictions on January 4, 2021, and the Pennsylvania order expired on January 4, 2021, new orders may be imposed if the spread of COVID-19 remains an imminent threat.  In addition, other state and local governments may also reimpose stricter restrictions that preclude access to National Fitness Partners' Planet Fitness locations and renders them useless.

116.    National Fitness Partners' losses continue to accrue, as many members have kept their memberships frozen or canceled memberships due to their inability to exercise at Planet Fitness properties due to the dangers posed by the physical presence of the novel coronavirus.

117.    The presence of the virus has also impeded National Fitness Partners' ability to attract new members, further amplifying the business income losses.

118.    National Fitness Partners purchased the Policy with an expectation that it would provide coverage in the event of business interruption and extended expenses, such as those suffered by National Fitness Partners as a result of the presence of COVID-19 at its fitness center premises and the ensuing government shutdown orders based on the presence of COVID-19 in the local communities.

Case ID: 210200529

119.     Additionally, National Fitness Partners had a reasonable expectation that the Policy's business interruption coverage would apply when a civil or governmental authority forced the closure of its insured properties, thereby barring access to the properties, due to an issue of public safety in the immediate area surrounding the properties.

### D.     AFM Denies National Fitness Partners' Claim in Bad Faith

120.     When the COVID-19 pandemic caused National Fitness Partners to close its fitness facilities, it timely submitted notice of a claim to AFM under the Policy.

121.     Because the AFM policy does not exclude COVID-19 business interruption losses, National Fitness Partners had a reasonable expectation that the Policy would provide coverage for its losses.

122.     On or around March 20, 2020, AFM called National Fitness Partners in response to National Fitness Partners' claim notice.  During that call, National Fitness Partners explained that the overwhelming presence of the virus and the ensuring government shut down orders had rendered National Fitness Partners' insured premises useless for their intended purpose and had forced National Fitness Partners to close its doors.

123.     During that call, National Fitness Partners also explained that a member had called to cancel his membership because he believed he had contracted COVID-19, and this member had worked out at one of National Fitness Partners' fitness facilities the night before.  National Fitness Partners could not confirm whether this customer had, in fact, tested positive for COVID-19, notwithstanding contacting the South Carolina Department of Health, because the Health Insurance Portability and Accountability Act (HIPAA) prevents sharing this member's private medical information.

Case ID: 210200529

124.    On April 16, 2020, AFM denied all coverage for National Fitness Partners' losses, specifying that no coverage is available under the business interruption coverage part or any of its coverage extensions, such as the civil authority coverage extension or the communicable disease coverage extension.  (*See* Exhibit 2.)

125.    National Fitness Partners responded on May 14, 2020, explaining that AFM misconstrued National Fitness Partners' statements from March 20, 2020 phone call, that the novel coronavirus had been present at its insured premises, and that none of the purported coverage limitations that AFM raised in its letter had any merit.  (*See* Exhibit 3.)

126.    AFM reaffirmed its coverage denial in a letter dated June 30, 2020.  (*See* Exhibit 4.)  Even though National Fitness Partners' May 14, 2020 letter provided additional facts relating to the presence of the novel coronavirus at insured premises and pointed to pertinent Policy provisions that AFM had misconstrued in its initial denial letter, AFM responded with a boilerplate form letter that did not address any of the additional information supplied by National Fitness Partners, and denied all coverage under the business interruption, civil authority, communicable disease, and extra expense coverage parts.

127.    Based on information and belief, in the early days of the COVID-19 pandemic, AFM and its parent company FM Global adopted and devised a scheme to deny all policyholders' claims arising from the COVID-19 pandemic, regardless of the facts giving rise to each policyholder's loss.

128.    As policyholders started to submit claims, senior executives in the FM Global claims department issued an internal memo to AFM's claim handlers titled "Talking Points on the 2019 Novel Coronavirus (2019-nCoV)" (the "Talking Points Memo").  (*See* Exhibit 5.)  Upon information and belief, AFM's claim handling department was instructed to use the Talking Points

Case ID: 210200529

Memo to guide the handling of COVID-19 claims, to provide responses to basic questions regarding coverage of such claims, and to shoehorn coverage for COVID-19 related losses into the communicable disease section of its Policies, based on the false assertion that all other coverage for COVID-19 related loss is excluded under Policy.

129.    For example, the Talking Points Memo advises that if an Insured's employee has a confirmed medical diagnosis of COVID-19 at an insured location, it would be considered the "actual presence" of the disease under the communicable disease section of the Policy.

130.    Although the Talking Points Memo suggests that some policyholders might be able to obtain coverage under the communicable disease coverage section of FM Global and AFM policies, the memo contains blanket instructions to deny coverage under other coverage parts without conducting a claims investigation.

131.    Indeed, without considering a policyholder's individual circumstances or the specific law of the various jurisdictions where policyholders might do business—the Talking Points Memo conclusively states that "[a] virus will *typically* not cause physical damage" (emphasis added), the presence of a communicable disease does not constitute physical damage, and the presence of a virus falls within the contamination exclusion.

132.    FM Global hardly tries to disguise the purpose of the Talking Points Memo: to limit all coverage arising from the COVID-19 pandemic to the sublimited communicable disease coverage, even though AFM's proVision policy does not otherwise contain any exclusion for business interruption losses resulting from the coronavirus.

133.    Here, however, AFM failed in bad faith to recognize coverage under the communicable disease coverage extension when it evaluated the claim submitted by National Fitness Partners.  Instead, AFM denied coverage under *all* sections of the Policy, even though (1)

Case ID: 210200529

National Fitness Partners has established the presence of the novel coronavirus at insured locations; and (2) there is no exclusion in the broad all risk policy that AFM issued that would otherwise bar or limit business interruption coverage for pandemic-related losses.

134.    The Talking Points Memo acknowledges that a COVID-19 positive individual's presence at an insured location demonstrates the actual presence of a communicable disease, and it further recognizes that in some jurisdictions the policyholder will not be able to access the medical records of an individual who contracted COVID-19 without that individual's consent.

135.    Nevertheless, in its effort to avoid coverage for National Fitness Partners' loss, AFM insisted that National Fitness Partners had no actual presence of the novel coronavirus at its insured premises, even though National Fitness Partners informed AFM that a member called to report that he had COVID-19 and had visited one of National Fitness Partners' fitness facilities the night before, but that further details could not be provided for privacy reasons.

136.    Thus, AFM disregarded even the overly restrictive guidelines it unilaterally set in the Talking Points Memo—as well as the plain terms of the Policy.  In doing so, AFM improperly placed its own financial interests ahead of the interests of its insured.

137.    Furthermore, AFM knowingly and intentionally failed to conduct a meaningful investigation or perform reasoned analysis as to National Fitness Partners' claim for coverage under all potential coverage sections under the Policy that may respond to the substantial losses National Fitness Partners has suffered during the COVID-19 pandemic, as illustrated by AFM's failure to consider coverage under the Attraction and Ingress/Egress Business Interruption Coverage Extensions and its failure to recognize that the contamination exclusion in the Policy does not apply to business interruption losses.

Case ID: 210200529

## CAUSES OF ACTION

## COUNT I

### (Request for Declaratory Judgment)

138.    National Fitness Partners realleges and incorporates by reference, as if fully set forth herein, the allegations in all prior paragraphs.

139.    An actual controversy has arisen between National Fitness Partners and AFM concerning the rights and obligations of the parties under the express terms of the Policy.

140.    The parties specifically dispute whether AFM is obligated to reimburse National Fitness Partners for the business interruption losses and extra expenses incurred as a result of the physical loss and damage inflicted to National Fitness Partners' insured locations due to the spread and presence of the novel coronavirus, as well as due to the governmental orders restricting access to the insured locations issued because of physical loss or damage to property caused by the presence of COVID-19 within five (5) miles of each insured location.

141.    This dispute is properly addressed in a declaratory judgment action because a declaratory judgment will serve the useful purpose of clarifying and settling the legal relations at issue.

142.    A declaratory judgment is also proper because it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding.

143.    A judicial declaration is necessary and appropriate so that the parties to this action may ascertain their rights and duties under the Policy.

144.    Under the Policy, AFM promised to reimburse National Fitness Partners for losses arising from "all risks" of physical loss and damage, including business interruption and extra expense losses.

Case ID: 210200529

145.     National Fitness Partners has suffered physical loss and damage at and around its properties due to the spread and presence of the novel coronavirus that causes COVID-19 and has also incurred business interruption loss and extra expense as a direct result of that physical loss and damage.

146.     National Fitness Partners has also incurred business interruption losses due to the governmental shutdown orders issued because of the physical loss or damage caused within five (5) miles of National Fitness Partners' insured premises.

147.     Accordingly, National Fitness Partners seeks a declaration from this Court that, under the Policy, AFM is obligated to reimburse National Fitness Partners for the losses and expenses it has incurred arising from physical loss and damage to its properties and the governmental shutdown orders.

148.     The Court's ruling on these issues will clarify and settle the legal relations at issue, and it will terminate and affect relief from the uncertainty, insecurity, and controversy as to all interested parties.

149.     A judicial determination is necessary and appropriate, so the parties may ascertain their respective rights and duties as to one another and may conduct themselves accordingly now and in the future.

### **Prayer for Relief for Count I**

WHEREFORE, National Fitness Partners requests a trial by jury and that the Court enter judgment in its favor as follows:

(1)     Declaring that under the Policy, AFM is obligated to reimburse National Fitness Partners for business interruption and extra expense losses arising as a direct result of the physical

Case ID: 210200529

loss and damage caused by the presence of the novel coronavirus that causes COVID-19 at the insured locations;

(2)     Alternatively, declaring that under the Policy, AFM is obligated to reimburse National Fitness Partners for business interruption and extra expense losses arising as a result of the governmental shutdown orders issued because of the physical loss or damage caused within five (5) miles of National Fitness Partners' insured premises;

(3)     Awarding National Fitness Partners the damages it has incurred or will incur;

(4)     Awarding National Fitness Partners its attorneys' fees and litigation costs; and

(5)     Awarding National Fitness Partners such other and further different relief that this Court deems just and proper.

## COUNT II

### (Breach of Contractual Duty to Reimburse National Fitness Partners for Business Interruption and Extra Expense Losses)

150.     National Fitness Partners realleges and incorporates by reference, as if fully set forth herein, the allegations in all prior paragraphs.

151.     The Policy is a valid and enforceable contract between National Fitness Partners and AFM.

152.     National Fitness Partners has performed under the terms of the Policy, including paying significant premiums in exchange for the coverage afforded under the Policy.

153.     Under the Policy, AFM promised to reimburse National Fitness Partners for losses arising from "all risks" of physical loss and damage, including business interruption and extra expense losses.

Case ID: 210200529

154.    National Fitness Partners has suffered physical loss and damage at and around its properties due to the presence of the novel coronavirus and has also incurred business interruption loss and extra expense as a direct result of that physical loss and damage.

155.    National Fitness Partners also has incurred losses due to the governmental shutdown orders issued because of COVID-19 related physical loss or damage within five (5) miles of National Fitness Partners' insured premises.

156.    National Fitness Partners also has incurred losses due to COVID-19 related physical loss or damage at Attraction properties.

157.    By refusing to reimburse National Fitness Partners, AFM has breached the promises it made to National Fitness Partners when it issued the Policy.

158.    As a result of AFM's breach, National Fitness Partners has suffered millions of dollars in damages, as well as damages resulting from AFM's improper withholding of insurance benefits that are due and owing under the Policy, and attorney's fees in this action.

**Prayer for Relief for Count II**

WHEREFORE, National Fitness Partners requests a trial by jury and that the Court enter judgment in its favor as follows:

(1)    Finding that AFM has breached its contractual obligation by refusing to reimburse National Fitness Partners for business interruption and extra expense losses arising as a direct result of the physical loss and damage caused by the presence of COVID-19 at the insured locations;

(2)    Finding that AFM has breached its contractual obligation by refusing to reimburse National Fitness Partners for business interruption and extra expenses losses arising as a result of

Case ID: 210200529

the governmental shutdown orders issued because of the physical loss or damage caused within five (5) miles of National Fitness Partners' insured premises;

(3)     Awarding National Fitness Partners the damages it has incurred or will incur;

(4)     Awarding National Fitness Partners its attorneys' fees and litigation costs; and

(5)     Awarding National Fitness Partners such other and further different relief that this Court deems just and proper.

## COUNT III

## (Bad Faith)

159.     National Fitness Partners realleges and incorporates by reference, as if fully set forth herein, the allegations in all prior paragraphs.

160.     Throughout the handling of this claim, AFM has consistently ignored information National Fitness Partners has supplied in support of its claim, National Fitness Partners' coverage arguments, and even its own internal guidelines.  The blatant disregard for National Fitness Partners' rights under the Policy constitutes bad faith.

161.     By way of example, AFM has misconstrued and mischaracterized information supplied by National Fitness Partners during telephone calls regarding this insurance claim in a deliberate attempt to support its improper coverage denial.

162.     Similarly, despite National Fitness Partners sending a thorough coverage letter to AFM in May 2020 explaining why its losses were covered under the Policy, AFM sent a form letter back to National Fitness Partners that failed to address any of the additional information supplied in National Fitness Partners' letter and that misrepresented pertinent provisions of the Policy.

Case ID: 210200529

163.    National Fitness Partners also provided AFM with a detailed description of a customer calling to report a suspected case of COVID-19 the day after that customer visited an insured location, as well as additional facts relating to the presence of COVID-19 at insured premises.  AFM ignored these facts and, contrary to the facts supplied by National Fitness Partners, denied coverage on the basis that "COVID-19 was not actually present at a described location owned, leased or rented by you," which is untrue.

164.    AFM also has misrepresented language in its insurance policy, such as the contamination exclusion in the Group III Exclusions of the Policy, to support its flawed argument that loss arising from a pandemic is excluded from the broad all risk coverage that AFM promised to provide.  Despite AFM's position, there is no exclusion in the Policy that bars coverage for Business Interruption loss resulting from the spread of the novel coronavirus.

165.    Although its policyholders, including National Fitness Partners, are facing substantial losses in the wake of the COVID-19 pandemic, upon information and belief AFM has been using the Talking Points Memo it drafted to guide its claims handling, without evaluating coverage based on the individualized facts of each policyholder and the law of the state that applies to the given policy.  The Talking Points Memo states that its own recommendations (which are overbroad and incorrect in the first place) may not apply to every situation, yet AFM staunchly applied these guidelines that are not part of the Policy in a calculated attempt to break its promises to National Fitness Partners at a time when National Fitness Partners is struggling to keep its doors open.

166.    Even worse, with respect to National Fitness Partners' claim, AFM has repeatedly ignored the facts relevant to National Fitness Partners' Claim and regurgitated form, blanket denials to escape its clear coverage obligations.

Case ID: 210200529

167.    Moreover, AFM's wrongful coverage denial plainly disregards the law of Pennsylvania where the Policy was issued, which does not require structural damage or physical alteration to property to establish physical damage *or* physical loss.

168.    As demonstrated through its apparent reliance on the Talking Points Memo, as well as the protracted course of dealing between the parties, AFM knows that it has no reasonable basis for denying National Fitness Partners' claim and it has recklessly disregarded its policy obligations to its policyholder.

169.    As a result of AFM's bad faith, National Fitness Partners has suffered and will continue to suffer damages, and was left with no option but to incur attorney's fees to vindicate its rights under the Policy.

170.    National Fitness Partners is entitled to damages as a result of AFM's bad faith in an amount to be proven at trial, including any special, punitive, treble, consequential, exemplary, statutory, or other damages available as a result of AFM's bad faith, as well as its attorneys' fees and litigation costs.

### Prayer for Relief for Count III

WHEREFORE, National Fitness Partners requests a trial by jury and that the Court enter judgment in its favor as follows:

(1)    Finding that AFM has repudiated its coverage obligations and refused to fulfill its obligations to National Fitness Partners in bad faith;

(2)    Awarding National Fitness Partners the damages it has incurred or will incur;

(3)    Awarding National Fitness Partners its attorneys' fees and litigation costs;

Case ID: 210200529

(4)     Awarding National Fitness Partners any special, punitive, treble, exemplary, consequential, statutory, or other damages available to National Fitness Partners as a result of AFM's bad faith; and

(5)     Awarding National Fitness Partners such other and further different relief that this Court deems just and proper.


Dated: February 5, 2021

**LeVAN MUHIC STAPLETON LLC**

By: _____
     John S. Stapleton, Pa. I.D. 200872
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
215.561.1500
jstapleton@levanmuhic.com

**KING & SPALDING LLP**
Shelby S. Guilbert, Jr. (*pro hac* to be filed)
Georgia Bar No. 315101
Nicholas G. Hill (*pro hac* to be filed)
Georgia Bar No. 744482
Amy Dehnel (*pro hac* to be filed)
Georgia Bar No. 707836
1180 Peachtree Street NE
Atlanta, GA 30309
404-572-4600 (Phone)
sguilbert@kslaw.com
nhill@kslaw.com
adehnel@kslaw.com

*Attorneys for Plaintiff*

Case ID: 210200529

# VERIFICATION

*Filed and Attested by the
Office of Judicial Records
05 FEB 2021 10:51 am*

I, Joseph A. Wacker, Esq. am the General Counsel of Keystone PGA Impairity, LLC.

I hereby state that the facts alleged in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

I understand that the statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities).

Date: __2/5/2021__



*Filed and Attested by the*
*Office of Judicial Records*
*05 FEB 2021 10:51 am*
*G. IMPERATO*

# Exhibit 1



270 Central Ave
Johnston, RI  02919
www.affiliatedfm.com

Thank you for placing your property insurance with AFM. We believe insurance should be straightforward and certain. That is why our proVision® 4100 policy is easy to read and navigate, while providing you broad coverage.

In addition to providing property insurance, AFM would like to help you protect your business and achieve your goals. In partnering with AFM, you have the strength of FM Global Group behind you, including a strong balance sheet and access to our market-leading loss prevention engineering products and services that are based on more than 180 years of experience as a property specialist. We are eager to work with you and your broker to choose how to best identify, prioritize and reduce future loss in a way that makes practical and affordable sense.

Our engineering services, combined with the comprehensive coverage of our proVision 4100, will give you peace of mind and allow you to focus on what matters most—making your business thrive. We are committed to maintaining a long-term, mutually beneficial relationship with you. And, it is our hope that you will take advantage of the many tools and resources we offer our clients, such as online training, onsite policy workshops and access to AFM Online, our powerful extranet that includes policy documents and data-driven risk management tools.

If you have any questions or concerns, please do not hesitate to contact your local account team.

Respectfully,

James R. Galloway
Senior Vice President, AFM

Case ID: 210200529

# Loss Reporting and Contact Information
# Atlanta Operations



---

**Claims Manager:**

**Michael J. Brugh, PE, CPCU**
Affiliated FM Insurance Company
Preston Ridge III, 3460 Preston Ridge Road, Suite 400
Alpharetta, GA 30005 USA
Tel: 770 777 3670

**Property Loss Reporting Procedure:**

To ensure that you receive prompt claims service, be sure to report a loss immediately. This enables us to provide you a professional property adjuster to examine your loss. Your loss may give rise to a claim under your Affiliated FM Insurance Company policy.

**Notice of Loss:**

The notice and report of any loss under an Affiliated FM Insurance Company policy should be communicated by calling the 24-hour claims hotline: **1-877-NEW-LOSS (1) 877 639 5677** or by emailing: **newlossatlanta@affiliatedfm.com**

If this first notice and report is made orally, it should be confirmed in writing including at least the same information as was provided in the oral first notice and report.

**Leaving a Message:**

When leaving a message, please include the following information:

- Name and phone number of person to contact
- A brief description of the loss

A claims adjuster will return your call promptly.

---

**Account Engineer:**

**David F. Moon**
Affiliated FM Insurance Company
Preston Ridge III, 3460 Preston Ridge Road, Suite 400
Alpharetta, GA 30005 USA
Tel: 770 777 3756
david.moon@affiliatedfm.com

**Jurisdictional Services:**

For more information on our jurisdictional inspections services, please contact the Account Engineer listed above

Case ID: 210200529

Case ID: 210200529

**IMPORTANT NOTICE OF PREMIUM DISCOUNTS AND SURCHARGES**
Section 38-75-755 of the Code of Laws of South Carolina requires
**AFFILIATED FM INSURANCE COMPANY**

to notify you of the availability of premium discounts for properties on which fixtures or construction techniques demonstrated to reduce the amount of loss in a windstorm have been installed or implemented. For your insured locations in South Carolina, there are many construction aspects that are reviewed which impact on the Wind portion of your rate. Your broker can advise you further about how your premium has been developed.

Among the factors considered are the following: the slope of the roof connecting down to the roof eaves line and if there is properly secured flashing; whether all glazed openings are protected for impact resistance and whether the roof tie downs such as clips, single wraps, double wraps, mechanical fasteners, or welds are in place; whether there are mechanical fasteners rated for the wind speed and whether welded connections are within the design for the wind speed; whether all other openings meet protection standards for impact resistance; and where applicable, whether braced gable roofs have been properly braced within the attic to the interior roof rafters.

Masonry construction may be inspected so as to be at least two thirds of the total wall area and if there are unrestrained connections of walls to foundations, this will impact adversely for wind.

Credits are given for buildings meeting Affiliated FM Engineering standards and for meeting the International Building Code as adopted by the South Carolina Building Codes Council as of 2007.  Buildings that do not meet these standards may be subject to premium surcharge or other underwriting conditions such as increased deductibles.

**TABLE OF MITIGATION AND FACTOR VARIABLES**

| # | Mitigation Measure | Factor Variables | Completed | Comment* |
|---|---|---|---|---|
| | | | | |
| 1 | Use of Storm Shutters | | X | 0-8% |
| 2 | Use of Roof Tie Downs | - Roof to Wall Connections<br>- Roof to Wall Strength | X | 0-2.7% |
| 3 | Construction Standards | - Impact Resistant Glass<br>- Openings<br>- Wall to floor strength | X | 1-2% |
| 4 | Building Codes | - SC Building Code | X | 1% |
| 5 | Policy Deductibles | | X | Various/Policyholder's Discretion |
| 6 | Other :   IBHS,    Safe Home | | NA | |

* Credits may vary depending upon construction, location, shape and other pertinent factors.

Contains copyright material of American Association of Insurance Services, Inc., 2007

Case ID: 210200529

Case ID: 210200529

**FILING EXEMPTION NOTICE**

Various states have enacted laws which suspend the requirement for the filing of rates and forms used for commercial and large commercial risks. This notice is being sent to you in accordance with the following states' requirement for the insurance company to notify clients affected by this law. If you have any questions or concerns, please contact your local office.

Applicable States:
Kentucky
Michigan
Pennsylvania
South Dakota

Case ID: 210200529

Case ID: 210200529

**FILING EXEMPTION NOTICE**

Various states have enacted laws which suspend the requirement for the filing of rates and forms used for commercial and large commercial risks. This notice is being sent to you in accordance with the following states' requirement for the insurance company to notify clients affected by this law. If you have any questions or concerns, please contact your local office.

Applicable States:
Kentucky
Michigan
Missouri
Pennsylvania
South Dakota

Form 7548                              Page 1 of 1                              January 2019
Affiliated FM Insurance Company

Case ID: 210200529

Case ID: 210200529

**IMPORTANT NOTICE OF PREMIUM DISCOUNTS AND SURCHARGES**
Section 38-75-755 of the Code of Laws of South Carolina requires
**AFFILIATED FM INSURANCE COMPANY**

to notify you of the availability of premium discounts for properties on which fixtures or construction techniques demonstrated to reduce the amount of loss in a windstorm have been installed or implemented. For your insured locations in South Carolina, there are many construction aspects that are reviewed which impact on the Wind portion of your rate. Your broker can advise you further about how your premium has been developed.

Among the factors considered are the following: the slope of the roof connecting down to the roof eaves line and if there is properly secured flashing; whether all glazed openings are protected for impact resistance and whether the roof tie downs such as clips, single wraps, double wraps, mechanical fasteners, or welds are in place; whether there are mechanical fasteners rated for the wind speed and whether welded connections are within the design for the wind speed; whether all other openings meet protection standards for impact resistance; and where applicable, whether braced gable roofs have been properly braced within the attic to the interior roof rafters.

Masonry construction may be inspected so as to be at least two thirds of the total wall area and if there are unrestrained connections of walls to foundations, this will impact adversely for wind.

Credits are given for buildings meeting Affiliated FM Engineering standards and for meeting the International Building Code as adopted by the South Carolina Building Codes Council as of 2007.  Buildings that do not meet these standards may be subject to premium surcharge or other underwriting conditions such as increased deductibles.

## TABLE OF MITIGATION AND FACTOR VARIABLES

| # | Mitigation Measure | Factor Variables | Completed | Comment* |
|---|---|---|---|---|
| | | | | |
| 1 | Use of Storm Shutters | | X | 0-8% |
| 2 | Use of Roof Tie Downs | - Roof to Wall Connections<br>- Roof to Wall Strength | X | 0-2.7% |
| 3 | Construction Standards | - Impact Resistant Glass<br>- Openings<br>- Wall to floor strength | X | 1-2% |
| 4 | Building Codes | - SC Building Code | X | 1% |
| 5 | Policy Deductibles | | X | Various/Policyholder's Discretion |
| 6 | Other :   IBHS,    Safe Home | | NA | |

* Credits may vary depending upon construction, location, shape and other pertinent factors.

Contains copyright material of American Association of Insurance Services, Inc., 2007

Case ID: 210200529

Case ID: 210200529



AFM

Affiliated FM Insurance Company
P.O Box 7500
Johnston, RI 02919

**DECLARATIONS PAGE**

| Policy No. | Previous Policy No. | DATE OF ISSUE |
|---|---|---|
| IA202 | GO704 | 20-May-2019 |
| **Account No.** | | |
| 1-88730 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and the premium charged, Affiliated FM Insurance Company, hereinafter referred to as the "Company", does insure:

> **INSURED:**
>
> Keystone PF Acquisition, LLC
> 2010 State Road
> Camp Hill, PA  17011
>
>
>
> (For Complete Title See Policy)

The term of this Policy is from the **18th day of May 2019 to the 18th day of May 2020 at 12:01a.m.,** Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in Alpharetta, Georgia this 20th day of May 2019.

Authorized Signature
WCB/cs

Secretary

President

© 2017 AFM. All rights reserved.

Case ID: 210200529

Case ID: 210200529

# DECLARATIONS

### A.  POLICY TERM:

18-May-2019 to 18-May-2020

### B.  NAMED INSURED:

Keystone PF Acquisition, LLC, and its wholly or majority owned subsidiaries and any interest which may now exist or hereinafter be created or acquired which are owned, controlled or operated by any one or more of those named insureds.

### C.  POLICY LIMIT:

This Company's total limit of liability, including any insured Business Interruption loss, will not exceed the Policy Limit of **$100,000,000** as a result of any one **occurrence** subject to the respective sub-limits of liability shown elsewhere in this Policy.

### D.  POLICY TERRITORY:

Coverage provided by this Policy is limited to property while located within the United States of America except as follows:

**Cyber Coverage Territory**

Coverage provided in Data, Programs or Software; Off-Premises Data Services Property Damage and Business Interruption and Computer Systems Non-Physical Damage is limited to anywhere in the world except Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

### E.  INSURANCE PROVIDED:

1. This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as follows:

   **Location Schedule:**

   1. 202 South New Hope Road, Gastonia, NC, 28054
   2. 2418 North Center Street, Hickory, NC, 28601
   3. 602 Park Street, Belmont, NC, 28012
   4. 1659 East Dixon Boulevard, Shelby, NC, 28152
   5. 335 West Plaza Drive Unit 1, Mooresville, NC, 28117
   6. 180 Concord Commons Place Southwest, Concord, NC, 28027
   7. 825 Crossroads Plaza Suite 23, Fort Mill, York (County), SC, 29708
   8. 2107 West Roosevelt Boulevard, Monroe, NC, 28110
   9. 1807 North Cherry Road Suite 115, Rock Hill, York (County), SC, 29732
   10. 1881 East Broad Street, Statesville, NC, 28625
   11. 1351 South Cannon Boulevard, Kannapolis, NC, 28083
   12. 710-B Jake Alexander Boulevard West, Salisbury, NC, 28147
   14. 480 Port View Drive, Harrisburg, PA, 17111-1226
   15. 6021 Allentown Boulevard, Harrisburg, PA, 17112-2602
   16. 101 Gettysburg Pike, Mechanicsburg, PA, 17055-5605
   17. 4850 Carlisle Pike, Mechanicsburg, PA, 17050-7713
   18. 1020 Commerce Park Drive, Williamsport, PA, 17701-5477
   19. 1186 Walnut Bottom Road, Carlisle, PA, 17015-9578
   20. 1 Walnut Bottom Road, Shippensburg, PA, 17257-9496
   21. 30 Baldwin Boulevard, Shamokin Dam, PA, 17876-9519
   22. 1695 Lincoln Way East, Chambersburg, PA, 17202-3077
   23. 2901 East College Avenue, State College, PA, 16801-7577

Case ID: 210200529

# DECLARATIONS

24. 310 East Penn Drive, Enola, PA, 17025-2175
25. 676-C North DuPont Boulevard Unit 696, Milford, DE, 19963-1002
26. 2010 State Road, Camp Hill, PA, 17011
27. 33 West Ridge Pike, Ste 401, Royersford, PA, 19468
28. 15620 Kutztown Road, Kutztown, PA, 19530
29. 720 NC 24 27 Bypass E, Albemarle, NC, 28001
31. 1851 South Christopher Columbus Boulevard Unit 3A, Philadelphia, PA, 19148
32. 8700 Frankford Avenue, Philadelphia, PA, 19136
33. 400 South State Road Suite 200, Springfield, PA, 19064
34. 800 Norman Eskridge Highway, Seaford, DE, 19973
35. 400 North Main Street, Doylestown, PA, 18901
36. 630 Park Way, Broomall, PA, 19008-4209
37. 9950 Roosevelt Boulevard, Philadelphia, PA, 19115-1705
38. 731 Route 113, Souderton, PA, 18964-1000
39. 501 Adams Avenue, Space 1A, Philadelphia, PA, 19120-1653
40. 4952 Pennell Road, Aston, PA, 19014-1867
41. 1856 Brownsville Road, Trevose, PA, 19053-3502
42. 5210 West Baltimore Avenue, Clifton Heights, PA, 19018-1809
43. 2350 West Oregon Avenue, Philadelphia, PA, 19145-4122
44. 2641-63 East York Street, Philadelphia, PA, 19125-3651
45. 1575 North 52nd Street, Ste 103 & 104, Philadelphia, PA, 19131-4726
46. 50 Greenfield Avenue, Ardmore, PA, 19003-1239
47. 825 Bethlehem Pike, Flourtown, PA, 19031-1122
48. 2920 Springfield Road, Broomall, PA, 19008-1224
49. 1619 The Fairway, Ste B-105, Jenkintown, PA, 19046-1425
50. 830 North Lansdowne Avenue, Drexel Hill, PA, 19026-1541
51. 6219 Ridge Avenue, Philadelphia, PA, 19128-2630
52. 6420 Frankford Avenue, Philadelphia, PA, 19135-3000
53. 5753 Wayne Avenue, Ste 1, Philadelphia, PA, 19144-3347
54. 751 Horsham Road, Bldg A, Lansdale, PA, 19446-6489
55. 216 Macdade Boulevard, Ridley Township, PA, 19033
56. 2800 Fox Street, Unit D, Ste 200, Philadelphia, PA, 19129-1838
57. 560 South Trooper Road, Norristown, PA, 19403-3415
58. 1851 Street Road, Bensalem, PA, 19020-4351
59. 229 Plaza Boulevard, Morrisville, PA, 19067-7601
60. 3000 Island Avenue, Philadelphia, PA, 19153-2022
61. 628 North West End Boulevard, Quakertown, PA, 18951
62. 7415 West Branch Highway, Lewisburg, PA, 17837

Case ID: 210200529

# DECLARATIONS

2. This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, not to exceed the limits of liability specified for the coverages indicated, while located as follows:

| **Location Schedule** | **Limits of Liability** |
|---|---|
| 13. 107 Saint Johns Church Road, Camp Hill, PA, 17011-4046 | |
| | |
| Real Property | NOT COVERED |
| Personal Property | $1,000,000 |
| Business Interruption | $100,000 |
| | |
| 30. 10  Newberry Commons, Etters, PA, 17319 | |
| | |
| Real Property | $2,731,480 |
| Personal Property | $1,000,000 |
| Business Interruption | $1,000,000 |

## F. **SUB-LIMITS:**

Unless otherwise stated below or elsewhere in this Policy, the following sub-limits of liability, including any insured Business Interruption loss, will be the maximum payable and will apply on a per **occurrence** basis.

The sub-limits stated below or elsewhere in this Policy are part of and not in addition to the Policy Limit.

When a limit of liability applies to a **location** or property, such limit of liability will be the maximum amount payable for all loss or damage.

There shall be no liability under this Policy when "NOT COVERED" is shown as a sublimit.

1.  $15,000,000   Earth Movement **annual aggregate** for all coverages provided, and is the maximum amount payable for all loss or damage caused by or resulting from Earth Movement, not to exceed:

    $50,000   Earth Movement **annual aggregate** as respects Errors and Omissions, Off-Premises Data Services, Off-Premises Service Interruption, Unnamed Property and Supply Chain combined.

2.  $10,000,000   Flood **annual aggregate** for all coverages provided, and is the maximum amount payable for all loss or damage caused by or resulting from Flood, not to exceed:

    $2,000,000   Flood **annual aggregate** for all coverages provided at the following **location**(s) combined:

    3000 Island Avenue, Philadelphia, PA, 19153-2022

    $50,000   Flood **annual aggregate** as respects Errors and Omissions, Off-Premises Data Services, Off-Premises Service Interruption, Unnamed Property and Supply Chain combined.

3.  $50,000   Real Property, per **location**, except for the following **location**(s):

    10 Newberry Commons, Etters, PA, 17319

Case ID: 210200529

# DECLARATIONS

**Additional Coverages**

| | |
|---|---|
| $1,000,000 | Accounts Receivable |
| $100,000 | Arson or Theft Reward |
| Policy Limit | Brand Protection |
| $100,000 | Change of Temperature |
| $100,000 | Communicable Disease - Property Damage **annual aggregate** |
| $500,000 | Data, Programs or Software **annual aggregate** |
| Policy Limit | Debris Removal |
| Policy Limit | Decontamination Costs |
| $100,000 | Deferred Payment |
| Policy Limit | Demolition and Increased Cost of Construction |
| $1,000,000 | Errors and Omissions |
| $250,000 | Expediting Expenses |
| $250,000 | **Fine Arts** not to exceed $10,000 per item for **irreplaceable Fine Arts** |
| $50,000 | Green Coverage not to exceed 25% of the amount of the property damage loss |
| $50,000 | Land and Water Clean Up Expense **annual aggregate** |
| $100,000 | Locks and Keys |
| $100,000 | Money and Securities |
| $2,500,000 | Newly Acquired Property |
| $50,000 | Off-Premises Data Services - Property Damage **annual aggregate** |
| $500,000 | Off-Premises Service Interruption - Property Damage |
| $100,000 | Professional Fees |
| Policy Limit | Property Removed from a Location |
| Policy Limit | Protection and Preservation of Property - Property Damage not to exceed $250,000 for security costs |
| $100,000 | Tax Treatment |
| $100,000 | Tenants Legal Liability |
| | Terrorism Coverage and the Supplemental United States Certified Act of Terrorism Endorsement |
| $100,000,000 | A. United States Certified Act of Terrorism coverage |
| $100,000 | B. Terrorism Coverage for Locations Outside of the United States **annual aggregate** not to exceed $100,000 **annual aggregate** for Property Removed from a Location, Unnamed Property and Flood |
| $500,000 | Transit not to exceed $250,000 for Business Interruption |
| $1,000,000 | Unnamed Property |
| $500,000 | **Valuable Papers and Records** not to exceed $10,000 per item for **irreplaceable Valuable Papers and Records** |

**Business Interruption Coverage**

| | |
|---|---|
| Policy Limit | Gross Earnings not to exceed 30 days for **ordinary payroll** |
| Policy Limit | Gross Profits for 12 months Period of Liability not to exceed 30 days for **ordinary payroll** |
| Policy Limit | Rental Income |
| $1,000,000 | Extra Expense |

**Business Interruption Coverage Extensions**

| | |
|---|---|
| $100,000 | Attraction Property |
| 30 Days | Civil or Military Authority |
| $100,000 | Communicable Disease - Business Interruption **annual aggregate** for a 12 Month Period of Liability |
| Included in Data, Programs or Software | Computer Systems Non-Physical Damage **annual aggregate** |
| $100,000 | Contractual Penalties |

Affiliated FM Policy No. IA202                                              *© 2019 AFM. All rights reserved.*

Case ID: 210200529

# DECLARATIONS

| | |
|---|---|
| $100,000 | Crisis Management not to exceed 30 Days |
| 90 Days | Extended Period of Liability |
| $500,000 | Ingress/Egress |
| $250,000 | Leasehold Interest |
| $100,000 | Logistics Extra Cost |
| $50,000 | Off-Premises Data Services - Business Interruption **annual aggregate** |
| $500,000 | Off-Premises Service Interruption - Business Interruption |
| Policy Limit | Protection and Preservation of Property - Business Interruption |
| Policy Limit | Research and Development |
| $250,000 | Soft Costs |
| $500,000 | Supply Chain |

## G.  **DEDUCTIBLE AMOUNT:**

This Company will not be liable for loss or damage, including any insured Business Interruption loss, in any one **occurrence** until the amount of loss or damage exceeds the deductible amount shown below and then this Company will only be liable for its share of the loss or damage in excess of the deductible amount.  If two or more deductibles apply to a single **occurrence**, then no more than the largest deductible amount will apply.  However, this Policy allows for the application of separate and distinct deductibles and deductibles for specific loss or damage as shown below.

The following deductible amounts shall apply per **occurrence**, unless otherwise stated, for insured loss or damage under this Policy:

1.    $50,000    Earthquake (per **location** for all coverages provided).


2.    Flood (per **location** for all coverages provided) as follows:

A. $50,000 per **location** for all **locations**,

EXCEPT:

B. $100,000 per **location** for the following **location**(s):

101 Gettysburg Pike, Mechanicsburg, PA, 17055-5605
1020 Commerce Park Drive, Williamsport, PA, 17701-5477
1851 South Christopher Columbus Boulevard Unit 3A, Philadelphia, PA, 19148
400 North Main Street, Doylestown, PA, 18901
825 Bethlehem Pike, Flourtown, PA, 19031-1122
830 North Lansdowne Avenue, Drexel Hill, PA, 19026-1541

C. $500,000 per **location** for the following **location**(s):

3000 Island Avenue, Philadelphia, PA

Case ID: 210200529

# DECLARATIONS

3.  Wind and/or Hail (per **location** for all coverages provided in this policy) associated with or occurring in conjunction with a storm or weather disturbance identified by name by any meteorological authority whether or not named prior to the loss at the following **location**(s):

A. For all **locations** in Tier One Wind and/or Hail Prone Counties, Parishes, & Territories per Form S-2:

This Company will not be liable for loss or damage unless the amount of loss or damage exceeds 5% of the combined value of property and annual business interruption value that would have been earned at the time such loss or damage at the **location** where loss or damage occurs plus that proportion of the 100% business interruption value at all other **locations** where business interruption loss ensues, in accordance with the valuation and business interruption sections of this policy, subject to a minimum deductible amount of $100,000 per **location**.  If coverage is provided for more than one **location**, this deductible percentage or minimum deductible amount will be applied separately to each **location**.

B. For all **locations** in Tier Two Wind and/or Hail Prone Counties & Parishes per Form S-3:

This Company will not be liable for loss or damage unless the amount of loss or damage exceeds 3% of the combined value of property and annual business interruption value that would have been earned at the time such loss or damage at the **location** where loss or damage occurs plus that proportion of the 100% business interruption value at all other **locations** where business interruption loss ensues, in accordance with the valuation and business interruption sections of this policy, subject to a minimum deductible amount of $100,000 per **location**.  If coverage is provided for more than one **location**, this deductible percentage or minimum deductible amount will be applied separately to each **location**.

C. For all **locations** in Wind and/or Hail Prone Counties Virginia to Maine per Form S-4:

$50,000 per **location**

4.  Communicable Disease Property Damage and Business Interruption:

Qualifying Period: This Company will not be liable for loss or damage unless access is limited, restricted or prohibited in excess of 48 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a deductible of:

A.  Property Damage: $10,000

B.  Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

Case ID: 210200529

# DECLARATIONS

5. Computer Systems Non-Physical Damage:

Qualifying Period: This Company will not be liable for loss resulting from the failure of the Insured's electronic data processing or media to operate as a direct result of a malicious act directed at the Named Insured, unless the Period of Liability exceeds 48 hours.

The Qualifying Period for the cost to temporarily protect under Item 4. b) shall be waived.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

6. Data, Programs, or Software:

Qualifying Period: This Company will not be liable for loss or damage caused by the malicious introduction of a machine code or instruction, unless the time to recreate or restore physically damaged property exceeds 48 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a deductible of:

A.   Property Damage: $10,000

B.   Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

7. Off-Premises Data Services Property Damage and Business Interruption:

Qualifying Period: This Company will not be liable for loss or damage unless the Period of Liability exceeds 48 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a deductible of:

A.   Property Damage: $10,000

B.   Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

Case ID: 210200529

# DECLARATIONS

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

8.  Off Premises Service Interruption Property Damage and Business Interruption:

Qualifying Period: This Company will not be liable for loss or damage unless the Period of Liability exceeds 24 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to the deductible(s) that would have applied to the cause of the interruption of services, but not less than:

A.   Property Damage: $10,000

B.   Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 1.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

9.  Builders Risk - Delay in Opening Deductible for property under the course of construction:

A.  Property Damage: $10,000

B.  Business Interruption: No coverage is provided for Business Interruption unless and until the period of interruption exceeds 14 days beginning from the time when operations would have begun if the direct physical loss or damage had not occurred. The Company will not be liable for loss until after this deductible period and does not cover loss or damage during such period.

Applying at the following **location**(s):

10 Newberry Commons, Etters, PA, 17319

10.      $10,000      All Other Losses.

Case ID: 210200529

# DECLARATIONS

## H.  SPECIAL TERMS AND CONDITIONS:

1. **Property Exclusion - PRO 408 (1/17)**

   PROPERTY EXCLUDED is amended to include:

   Contractors' equipment, tools, and cranes of every type, as respects property in the course of construction.

2. **Specific Flood Exclusion - PRO 128 (4/15)**

   ADDITIONAL COVERAGES, **Flood** does not apply to Newly Acquired Property

3. **Overhead Power Transmission Lines Exclusion - PRO 130 (4/15)**

   ADDITIONAL COVERAGES, Off-Premises Service Interruption - Property Damage and BUSINESS INTERRUPTION COVERAGE EXTENSIONS, Off-Premises Service Interruption - Business Interruption are amended to include the following exclusions:

   The interruption of incoming services for any reason involving overhead power transmission lines.

   Applying only to locations in Tier One Wind and/or Hail Prone Counties, Parishes, & Territories per Form S-2 or Tier Two Wind and/or Hail Prone Counties & Parishes per Form S-3

4. **Combined Data, Programs or Software and Computer Systems Non-Physical Damage**

   The Company's total liability for Data, Programs or Software and Computer Systems Non-Physical Damage combined will not exceed $500,000 **annual aggregate** and replaces the corresponding limits of liability shown in the sublimit section.

5. **United States Certified Act of Terrorism 2015**

   As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of terrorism contained in DEFINITIONS is declared null and void and it is agreed that an event defined as a Certified Act of Terrorism under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT attached to this Policy shall be considered terrorism within the terms of this policy.  Notwithstanding anything contained in this Policy to the contrary, this Policy provides coverage for direct physical loss or damage to insured property and any resulting Business Interruption loss, as provided in the Policy, caused by or resulting from a Certified Act of Terrorism only to the extent coverage is provided under the terms and conditions of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT attached to this policy.  Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT and this Policy is not recoverable under this Policy.

Case ID: 210200529

# DECLARATIONS

## I.  INDEX OF FORMS:

The following forms are made part of this Policy:

| Title | Form No. | Edition |
|---|---|---|
| Declarations Page | PRO DEC 4100 | (04/15) |
| Declarations | PRO S-1 4100 | (01/17) |
| Tier One Wind and/or Hail Prone Counties, Parishes & Territories | S-2 | (05/19) |
| Tier Two Wind and/or Hail Prone Counties & Parishes | S-3 | (05/19) |
| Wind and/or Hail Prone Counties Virginia to Maine | S-4 | (05/19) |
| All Risk Coverage | PRO AR 4100 | (01/17) |
| Supplemental United States Certified Act of Terrorism Endorsement | 7312 | (1/15) |
| North Carolina Amendatory Endorsement | AFM 6499 | (04/15) |
| Pennsylvania Amendatory Endorsement | AFM 6333 | (04/15) |
| South Carolina Amendatory Endorsement | AFM 6500 | (04/15) |

Case ID: 210200529

# TIER ONE
# WIND AND/OR HAIL PRONE COUNTIES, PARISHES & TERRITORIES

**Alabama, counties of:**

Baldwin, Mobile

**Florida, counties of:**

Bay, Brevard, Broward, Calhoun, Charlotte, Citrus, Collier, Dixie, Duval, Escambia, Flagler, Franklin, Gulf, Hernando, Hillsborough, Indian River, Jefferson, Lafayette, Lee, Leon, Levy, Liberty, Manatee, Martin, Miami-Dade, Monroe, Nassau, Okaloosa, Palm Beach, Pasco, Pinellas, St. Johns, St. Lucie, Santa Rosa, Sarasota, Taylor, Volusia, Wakulla, Walton, Washington

**Georgia, counties of:**

Bryan, Camden, Chatham, Glynn, Liberty, McIntosh

**Hawaii:**

All Islands

**Louisiana, parishes of:**

Assumption, Calcasieu, Cameron, Iberia, Jefferson, Lafourche, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John Baptist, St. Martin (southern portion), St. Mary, St. Tammany, Terrebonne, Vermilion

**Mississippi, counties of:**

Hancock, Harrison, Jackson, Stone

**North Carolina, counties of:**

Beaufort, Brunswick, Camden, Carteret, Chowan, Craven, Currituck, Dare, Hyde, Jones, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Tyrrell, Washington

**Puerto Rico:**

Entire Territory

**South Carolina, counties of:**

Beaufort, Berkeley, Charleston, Colleton, Dorchester, Georgetown, Horry, Jasper

**Texas, counties of:**

Aransas, Brazoria, Calhoun, Cameron, Chambers, Galveston, Jackson, Jefferson, Kenedy, Kleberg, Matagorda, Nueces, Orange, Refugio, San Patricio, Willacy

**U.S. Virgin Islands:**

All Islands

S-2 (05/19)
Affiliated FM Insurance Company Policy No. IA202
*© 2017 AFM. All rights reserved.*

Case ID: 210200529

Case ID: 210200529

# TIER TWO
# WIND AND/OR HAIL PRONE COUNTIES & PARISHES

**Alabama, counties of:**

Covington, Escambia

**Florida, counties of:**

Alachua, Baker, Bradford, Clay, Columbia, DeSoto, Gadsden, Gilchrist, Glades, Hamilton, Hardee, Hendry, Highlands, Holmes, Jackson, Lake, Madison, Marion, Okeechobee, Orange, Osceola, Polk, Putnam, Seminole, Sumter, Suwannee, Union

**Georgia, counties of:**

Brantley, Charlton, Effingham, Long, Wayne

**Louisiana, parishes of:**

Acadia, Ascension, Beauregard, East Baton Rouge, Iberville, Jefferson Davis, Lafayette, Livingston, St. Martin (northern portion), Tangipahoa, Washington, West Baton Rouge

**Mississippi, counties of:**

George, Pearl River

**North Carolina, counties of:**

Bertie, Bladen, Columbus, Duplin, Gates, Hertford, Lenoir, Martin, Pitt, Sampson

**South Carolina, counties of:**

Marion, Williamsburg

**Texas, counties of:**

Bee, Brooks, Fort Bend, Goliad, Hardin, Harris, Hidalgo, Jasper, Jim Wells, Liberty, Newton, Victoria, Wharton

S-3 (05/19)
Affiliated FM Insurance Company Policy No. IA202
*© 2017 AFM. All rights reserved.*

Case ID: 210200529

Case ID: 210200529

# WIND AND/OR HAIL PRONE COUNTIES
# VIRGINIA TO MAINE

**Connecticut, counties of:**

Fairfield, Hartford, Middlesex, New Haven, New London, Tolland, Windham

**Delaware, counties of:**

Kent, New Castle, Sussex

**Maine, counties of:**

Androscoggin, Cumberland, Hancock, Knox, Lincoln, Sagadahoc, Waldo, Washington,  York

**Maryland, counties of:**

Calvert, Charles, Dorchester, St. Mary's, Somerset, Wicomico, Worcester

**Massachusetts, counties of:**

Barnstable, Bristol, Dukes, Essex, Middlesex, Nantucket, Norfolk, Plymouth, Suffolk

**New Hampshire, counties of:**

Rockingham, Strafford

**New Jersey, counties of:**

Atlantic, Bergen, Burlington, Cape May, Cumberland, Essex, Hudson, Middlesex, Monmouth, Ocean, Salem, Union

**New York, counties of:**

Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk, Westchester

**Rhode Island, counties of:**

Bristol, Kent, Newport, Providence, Washington

**Virginia, counties and independent cities of:**

counties of:  Accomack, Gloucester, Isle of Wight, James City, Lancaster, Mathews, Middlesex, Northampton, Northumberland, Surry, York

independent cities of:  Chesapeake, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach, Williamsburg

Affiliated FM Insurance Company Policy No. IA202
© *2017 AFM. All rights reserved.*

Case ID: 210200529

Case ID: 210200529





# ALL RISK COVERAGE

## Table of Contents

**PROPERTY INSURED** .......................................................................................................... 1

    Real Property .......................................................................................................................... 1

    Personal Property .................................................................................................................... 1

**PROPERTY EXCLUDED** ..................................................................................................... 1

**EXCLUSIONS** ........................................................................................................................ 2

    Group I ...................................................................................................................................... 2

    Group II ..................................................................................................................................... 3

    Group III .................................................................................................................................... 4

**ADDITIONAL COVERAGES** ............................................................................................. 5

    Accounts Receivable .............................................................................................................. 5

    Arson or Theft Reward ............................................................................................................ 5

    Brand Protection ...................................................................................................................... 6

    Change of Temperature .......................................................................................................... 6

    Communicable Disease – Property Damage ........................................................................ 6

    Data, Programs or Software .................................................................................................... 7

    Debris Removal ....................................................................................................................... 8

    Decontamination Costs ........................................................................................................... 8

    Deferred Payment ................................................................................................................... 8

    Demolition and Increased Cost of Construction ................................................................... 9

    Earth Movement ...................................................................................................................... 10

    Errors and Omissions ............................................................................................................. 10

    Expediting Expenses ............................................................................................................... 10

    Fine Arts and Valuable Papers and Records ........................................................................ 11

    Flood ........................................................................................................................................ 11

    Green Coverage ...................................................................................................................... 11

    Land and Water Clean Up Expense ....................................................................................... 12

    Locks and Keys ....................................................................................................................... 12

    Money and Securities .............................................................................................................. 12

    Newly Acquired Property ......................................................................................................... 12

Case ID: 210200529





Off-Premises Data Services – Property Damage…………………………………………………………13

Off-Premises Service Interruption – Property Damage .............................................................13

Professional Fees .................................................................................................................13

Property Removed from a Location .........................................................................................14

Protection and Preservation of Property – Property Damage .....................................................14

Tax Treatment ....................................................................................................................14

Tenants Legal Liability ..........................................................................................................15

Terrorism............................................................................................................................15

Transit ...............................................................................................................................16

Unnamed Property................................................................................................................18

**BUSINESS INTERRUPTION** ........................................................................................ 19

Loss Insured .......................................................................................................................19

Business Interruption Coverage .............................................................................................20

    Gross Earnings ..........................................................................................................20

    Gross Profits .............................................................................................................20

    Rental Income ...........................................................................................................21

    Extra Expense ...........................................................................................................22

    BI Select ..................................................................................................................22

Period of Liability .................................................................................................................22

Business Interruption Exclusions ...........................................................................................23

**BUSINESS INTERRUPTION COVERAGE EXTENSIONS** ................................................. 24

Attraction Property ..............................................................................................................24

Civil or Military Authority .....................................................................................................24

Communicable Disease – Business Interruption…………………………………………………………… 24

Computer Systems Non-Physical Damage ...............................................................................25

Contractual Penalties ...........................................................................................................25

Crisis Management ...............................................................................................................26

Extended Period of Liability ...................................................................................................26

Ingress/Egress....................................................................................................................27

Leasehold Interest ...............................................................................................................27

Logistics Extra Cost .............................................................................................................27

Off-Premises Data Services – Business Interruption…………………………………………………………28

Off-Premises Service Interruption – Business Interruption ........................................................29

Protection and Preservation of Property – Business Interruption.................................................30

Research and Development ....................................................................................................30

Case ID: 210200529




Soft Costs ..................................................................................................................................... 30

Supply Chain .............................................................................................................................. 30

**LOSS ADJUSTMENT AND SETTLEMENT** ....................................................................... 32

Abandonment ............................................................................................................................. 32

Appraisal .................................................................................................................................... 32

Collection From Others ............................................................................................................. 32

Company Option ........................................................................................................................ 32

Currency for Loss Payment ....................................................................................................... 32

Legal Action Against this Company .......................................................................................... 33

Loss Adjustment and Payable .................................................................................................... 33

Other Insurance .......................................................................................................................... 33

Requirements in Case of Loss ................................................................................................... 33

Settlement of Claims .................................................................................................................. 34

Subrogation ................................................................................................................................ 35

Valuation .................................................................................................................................... 35

**GENERAL CONDITIONS** ..................................................................................................... 37

Application of Policy to Date or Time Recognition .................................................................. 37

Cancellation/Non-Renewal ........................................................................................................ 37

Conformity to Statute ................................................................................................................ 37

First Named Insured ................................................................................................................... 37

Increase in Hazard ..................................................................................................................... 38

Inspections ................................................................................................................................. 38

Liberalization Clause ................................................................................................................. 38

Misrepresentation and Fraud ..................................................................................................... 38

Mortgagee/Lenders Loss Payable .............................................................................................. 38

Policy Modification .................................................................................................................... 40

Reinstatement of Limits after a Loss ......................................................................................... 40

Suspension ................................................................................................................................. 40

Transfer or Rights and Duties under this Policy ........................................................................ 40

**DEFINITIONS** ......................................................................................................................... 41

Case ID: 210200529





# ALL RISK COVERAGE

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

## A. PROPERTY INSURED

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, at or within 1,000 feet of a **described location,** to the extent of the interest of the Insured in such property.

1. Real Property in which the Insured has an insurable interest.

2. Personal Property:

   **a)** Owned by the Insured.

   **b)** Consisting of improvements and betterments in which the Insured has an insurable interest.

   **c)** Of directors, officers and employees of the Insured.

   **d)** Of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

   **e)** Of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to such Personal Property.

   This Company may defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage to such Personal Property. This Company may, without prejudice, investigate, negotiate and settle any claim or suit as this Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction, while at or within 1,000 feet of a **described location**, to the extent that the Insured has agreed, prior to loss, to keep such interest insured for insured physical loss or damage to such property. Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and will not extend to any Business Interruption coverage provided in this Policy.

## B. PROPERTY EXCLUDED

This Policy excludes the following except as otherwise stated in this Policy:

1. Land, water or any substance in or on land.

2. Growing crops, standing timber or animals.

3. Bridges and tunnels intended for use by motor vehicles licensed for highway use.

4. Reservoirs, canals, dikes or dams.

5. Docks, piers or wharves which are not a structural part of a building.

6. Currency, money, notes or securities, except as provided by the Money and Securities coverage in this Policy.

7. Motor vehicles licensed for highway use or owned by directors, officers or employees of the Insured.

*© 2017 AFM. All rights reserved.*

Case ID: 210200529





8.  Satellites, aircraft or watercraft, except if on land, unfueled and manufactured by the Insured.

9.  Property sold by the Insured under conditional sale, trust agreement, installment payment or other deferred payment plan after delivery to the customer, except as provided by the Deferred Payment coverage in this Policy.

10. Underground mines or mine shafts or any property within such mine or shaft.

11. Property while in transit, except as otherwise provided in this Policy.

12. Electronic data, programs or software, except when they are stock in process, finished goods manufactured by the Insured, raw materials, supplies or other merchandise not manufactured by the Insured or as provided by the Data, Programs or Software coverage in this Policy.

13. Property while located **offshore**, except as provided by the Transit coverage in this Policy.

# C. <u>EXCLUSIONS</u>

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

**GROUP I:** This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss or damage:

1.  Nuclear reaction or nuclear radiation or radioactive contamination. However:

    a)  If physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination**.**

    b)  This Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the **location**. This coverage does not apply to any act, loss or damage excluded in Group I Item 2f of this Exclusions clause.

    This exclusion Group I Item 1 and the exceptions in Group I Item 1a and Group I Item 1b above do not apply to any act, loss or damage which also comes within the terms of exclusion Group I Item 2b of this Exclusions clause.

2.  a)  Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

    i)   Government or sovereign power (de jure or de facto);

    ii)  Military, naval or air forces; or

    iii) Agent or authority of any party specified in i) or ii) above.

    b)  Discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

    c)  Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

    d)  Seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

    e)  Risks of contraband, or illegal transportation or trade.

Case ID: 210200529





**f)** **Terrorism**, including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except to the extent provided in the Terrorism coverage of this Policy. However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to insured property. This coverage exception for such resulting fire loss or damage does not apply to:

    **i)** Direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

    **ii)** Any coverage provided in the Business Interruption section of this Policy or to any other coverages provided by this Policy.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion or any other risk of physical loss or damage covered elsewhere in this Policy.

If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2a of this Exclusions clause then Group I Item 2a applies in place of this Group I Item 2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2b of this Exclusions clause then Group I Item 2b applies in place of this Group I Item 2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2c of this Exclusions clause then Group I Item 2c applies in place of this Group I Item 2f exclusion.

If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this Group I Item 2f exclusion applies in place of Group I Item 1 of this Exclusions clause.

**3.** Any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time by:

    **a)** An Insured or any proprietor, partner, director, trustee, officer or employee of an Insured; or

    **b)** Any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured. This coverage does not apply to any act excluded in Group I Item 2f of this Exclusions clause. In no event does this Policy cover loss by theft by any individual specified in a or b above.

**4.** Lack of incoming electricity, fuel, water, gas, steam or refrigerant; outgoing sewerage; or incoming or outgoing voice, data or video; all when caused by an event off the **location**, except as provided by the Off-Premises Data Services and Off-Premises Service Interruption coverages in this Policy. If the lack of such a service directly causes insured physical damage at the **location**, then only that resulting damage is insured.

**5.** **Earth movement**, except as otherwise provided in this Policy.

**6.** **Flood,** except as otherwise provided in this Policy.

**7.** Seepage or influx of water from natural underground sources.

**GROUP II:** This Policy excludes the following, however, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

© *2017 AFM. All rights reserved.*

Case ID: 210200529

 

1.  Wear and tear, deterioration, depletion, rust, corrosion, erosion, inherent vice or latent defect.

2.  Faulty workmanship, material, construction or design.

3.  Loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested or otherwise worked on.

4.  Loss or damage caused by or resulting from:

    **a)**  Changes of temperature, except damage to machinery or equipment including fire protective equipment;

    **b)**  Changes in relative humidity,

    All whether atmospheric or not, except as provided by the Change of Temperature and Off-Premises Service Interruption coverages in this Policy.

5.  Settling, cracking, shrinking, bulging or expansion of:

    **a)**  Foundations.

    **b)**  Walls.

    **c)**  Floors.

    **d)**  Pavements or roadways.

    **e)**  Roofs.

    **f)**  Ceilings.

6.  Loss or damage to personal property in the open from rain, sleet, snow, sand or dust.

7.  Theft of precious metal or stones, except when such property is used by the Insured for industrial purposes.

8.  Insect, animal or vermin damage.

**GROUP III:** This Policy excludes:

1.  Indirect or remote loss or damage.

2.  Interruption of business, except to the extent provided in this Policy.

3.  Loss of market or loss of use.

4.  Loss or damage or deterioration arising from any delay.

5.  Mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6.  Loss from enforcement of any law or ordinance:

    **a)**  Regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

    **b)**  Requiring the demolition of any property, including the cost in removing its debris;

© *2017 AFM. All rights reserved.*
Case ID: 210200529





Except as provided by the Decontamination Costs and Demolition and Increased Cost of Construction coverages in this Policy.

7. Loss or damage resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

8. **Contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion does not apply to radioactive contamination which is excluded elsewhere in this Policy.

9. Shrinkage, evaporation or loss of weight, unless directly resulting from other physical damage not excluded by this Policy.

10. Changes in color, flavor, texture or finish, unless directly resulting from other physical damage not excluded by this Policy.

## D.  ADDITIONAL COVERAGES

The Additional Coverages below are subject to all the terms and conditions of this Policy including, but not limited to, the limits of liability, deductibles and exclusions shown in the Declarations section.

### 1.  Accounts Receivable

This Policy covers amounts which the Insured is unable to collect as a direct result of insured physical loss or damage to accounts receivable records at a **location**.

Coverage includes:

a) Interest charges on any loan to offset impaired collections pending repayment of sums that cannot be collected. Unearned interest charges and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted.

b) Collection expenses in excess of normal collection costs.

c) Other reasonable expenses incurred by the Insured in recreating records of accounts receivable.

After payment of loss by this Company, all amounts recovered by the Insured on accounts receivable for which the Insured has been indemnified will belong to and be paid to this Company by the Insured up to the total amount of loss paid by this Company. All recoveries in excess of such amounts will belong to the Insured.

Accounts Receivable Exclusions: As respects Accounts Receivable, the following additional exclusions apply:

This Policy does not cover shortage resulting from:

a) Bookkeeping, accounting, or billing error or omission.

b) Alteration, falsification, manipulation, concealment, destruction or disposal of records of accounts receivable committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property.

Case ID: 210200529





## 2. Arson or Theft Reward

This Policy covers payment of any reward offered by the Insured or on the Insured's behalf for information that leads to conviction of the perpetrator(s) of insured:

**a)**  Arson to; or

**b)**  Theft of;

Insured property.

## 3. Brand Protection

This Policy gives control of physically damaged property consisting of finished goods or merchandise manufactured by or for the Insured as follows:

**a)**  The Insured will have full rights to the possession and control of damaged property in the event of insured physical loss or damage to such property provided proper testing is done to show which property is physically damaged.

**b)**  The Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

Physically damaged property judged by the Insured to be:

**i)**  Unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

**ii)**  Fit for reprocessing or selling and this Company elects to take all or any part of physically damaged branded and labeled property, the Insured may at this Company's expense:

(a)  Stamp "salvage" on the property or its containers; or

(b)  Remove or obliterate the brands or labels,

If doing so will not damage the property.

The Insured must relabel the property or containers in compliance with the applicable requirements of law.

**c)**  Any salvage proceeds received will go to the:

**i)**  Company at the time of loss settlement; or

**ii)**  Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

## 4. Change of Temperature

This Policy covers spoilage of insured stock and supplies due to:

**a)**  Changes of temperature or changes in relative humidity,

Directly resulting from the interruption, in whole or part, of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at a **location**.

Case ID: 210200529





## 5. Communicable Disease – Property Damage

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

**a)** An order of an authorized governmental agency regulating or as result of such presence of **communicable disease**; or

**b)** A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

This Policy covers the reasonable and necessary costs incurred by the Insured at such **described location** for the:

**a)** Cleanup, removal and disposal of such presence of **communicable disease** from insured property; and

**b)** Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of **communicable disease** on insured property.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to such presence of **communicable disease**.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Communicable Disease - Property Damage Exclusions: As respects Communicable Disease – Property Damage, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 6. Data, Programs or Software

This Policy covers insured **physical loss or damage to electronic data, programs or software**, including physical loss or damage caused by the malicious introduction of a machine code or instruction, while anywhere within this Policy's Territory, including while in transit.

This coverage includes:

**a)** The cost of the following reasonable and necessary actions taken by the Insured due to actual insured **physical loss or damage to electronic data, programs or software:**

    **i)** To temporarily protect and preserve insured electronic data, programs or software.

    **ii)** For the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

    **iii)** To expedite the permanent repair or replacement of such damaged property.

**b)** The reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**. In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

This Additional Coverage excludes loss or damage to data, programs or software when they are **stock in process**, finished goods manufactured by the Insured, **raw materials**, supplies or other merchandise not manufactured by the Insured.

© 2017 AFM. All rights reserved.

Case ID: 210200529





Data, Programs or Software Exclusions: As respects Data, Programs or Software, the following additional exclusion applies:

This Policy excludes the following but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

**a)**   Errors or omissions in processing or copying.

**b)**   Loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

Data, Programs or Software Valuation: On property insured under this coverage, the loss amount will not exceed:

**a)**   The cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer; or

**b)**   The blank value of the media if not repaired, replaced or restored within two years from the date of loss.

## 7.   Debris Removal

This Policy covers the reasonable and necessary costs incurred to remove debris from a **location** that remains as the direct result of insured physical loss or damage.

This coverage does not cover the costs of removing:

**a)**   Contaminated uninsured property; or

**b)**   The **contaminant** in or on uninsured property;

Whether or not the **contamination** results from insured physical loss or damage.

This coverage includes the costs of removal of contaminated insured property or the **contaminant** in or on insured property only if the **contamination**, due to the actual not suspected presence of **contaminant(s)**, of the debris resulted directly from other physical damage not excluded by the Policy.

## 8.   Decontamination Costs

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance. This coverage applies only to that part of insured property so contaminated due to such presence of **contaminant(s)** as a direct result of insured physical damage.

The Company is not liable for the costs required for removing:

**a)**   Contaminated uninsured property; or

**b)**   The **contaminant** in or on uninsured property;

Whether or not the **contamination** results from insured physical loss or damage.

Case ID: 210200529

 

### 9. Deferred Payment

This Policy covers the Insured's interest in personal property of the type insured that has been sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan, if such property sustains physical loss or damage insured by this Policy and only to the extent the Insured is unable to collect the unpaid balance of such interest.

This coverage applies from the time the property is delivered to the buyer until the Insured's interest in it has ceased or the policy terminates or expires, whichever is first.

Deferred Payment Exclusion: As respects Deferred Payment, the following additional exclusion applies:

This Policy excludes:

**a)** Theft or conversion by the buyer of the property after the buyer has taken possession of such property.

**b)** Property not within this Policy's Territory.

Deferred Payment Valuation: On property insured under this coverage, the loss amount will not exceed the lesser of the following:

**a)** The total amount of unpaid installments less finance charges.

**b)** The **actual cash value** of the property on the date of loss or damage.

**c)** The cost to repair or replace with material of like size, kind and quality.

### 10. Demolition and Increased Cost of Construction

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

**a)** Such law or ordinance is enforced as a direct result of insured physical loss or damage at a **location**;

**b)** Such law or ordinance is in force at the time of such loss or damage; and

**c)** Such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that Regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

**a)** Demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

**b)** Repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.

Case ID: 210200529




The Company's maximum liability for this Coverage A at each location in any occurrence will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

**a)**   The reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

**b)**   The cost to rebuild on the same site.

Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

Demolition and Increased Cost of Construction Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced, the loss amount will be the difference between:

**a)**   The **actual cash value**; and

**b)**   The cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

Demolition and Increased Cost of Construction Exclusions: As respects Demolition and Increased Cost of Construction, the following additional exclusions apply:

This Policy does not cover:

**a)**   Any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.

**b)**   Any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the **location** suffering the physical loss or damage.

## 11. Earth Movement

This Policy covers physical loss or damage caused by or resulting from **earth movement**.

## 12. Errors and Omissions

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

**a)**   In the address of a property insured by this Policy which existed at the inception date of this Policy or in any subsequent amendments to this Policy;

**b)**   That fails to include any **location**:

    **i)**   Owned; or

    **ii)**   Occupied by the Insured; or

**c)**   That results in cancellation of insured property under this Policy;

Then coverage applies to the extent this Policy would have provided coverage had the error or unintentional omission not been made.

© *2017 AFM. All rights reserved.*

Case ID: 210200529




It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

## 13. Expediting Expenses

This Policy covers the reasonable and necessary costs incurred to:

**a)** Temporarily repair or replace; and

**b)** Expedite the permanent repair or replacement of;

Insured property that has sustained insured physical loss or damage.

This coverage does not include expenses payable elsewhere in this Policy including the cost of permanent repair or replacement of damaged property.

## 14. Fine Arts and Valuable Papers and Records

This Policy covers **fine arts** and **valuable papers and records** while anywhere within this Policy's Territory including while in transit.

Fine Arts and Valuable Papers and Records Exclusion: As respects Fine Arts and Valuable Papers and Records, the following additional exclusion applies:

This Policy excludes:

**a)** Loss or damage to any **fine arts** as a result of restoring, repairing or retouching processes.

**b)** Errors or omissions in the processing or copying of **valuable papers and records.**

Fine Arts and Valuable Papers and Records Valuation: On property insured under this coverage, the loss amount will not exceed the lesser of the following:

**a)** The cost to repair or restore the article to the condition that existed immediately prior to the loss;

**b)** The cost to replace the article; or

**c)** The value designated for the article as shown in the Declarations section of this Policy or on a schedule on file with this Company.

In case of physical loss or damage to a **fine arts** or **valuable papers and records** article that is part of a pair or a set, this Company will pay the lesser of the full value or the amount scheduled, if any, of the value of such pair or set only if the damaged article cannot be repaired or restored to its condition before the loss and the Insured surrenders the remaining article or articles of the pair or set to this Company.

## 15. Flood

This Policy covers physical loss or damage caused by or resulting from **flood**.

## 16. Green Coverage

This Policy covers the reasonable and necessary additional costs incurred by the Insured, as a direct result of insured physical loss or damage:

© 2017 AFM. All rights reserved.

Case ID: 210200529





a)   To repair or replace physically damaged insured property with material of like kind and quality which qualifies as **Green**.

b)   To replace the insured physically damaged portions of insured roofing systems with vegetative roof(s), including but not limited to the addition of trees, shrubs, plants and lawns to those roof(s), which qualify as **Green,** if this Policy covers Real Property.

c)   As part of **Green** reconstruction, to flush out the air in the area of the physically damaged insured property with 100 percent outside air and to provide replacement filtration media for the building's ventilation system that controls the damaged area.

d)   For an accredited professional certified by a **Green Authority** to participate in the design and construction for repairing or rebuilding the physically damaged insured property as **Green**.

e)   For the process of certification or recertification of the repaired or replaced insured property as **Green.**

f)   For **Green** removal, disposal or recycling of the damaged insured property.

Notwithstanding any other provision in this Policy, the Insured must repair or replace the insured real and/or personal property lost, damaged or destroyed as a condition of this coverage.

Green Coverage Exclusions: As respects Green Coverage, the following additional exclusions apply:

This Policy excludes:

a)   Stock, **raw materials**, work in process, finished goods, merchandise, **production machinery and equipment**, electronic data processing equipment not used in the functional support of the real property, molds and dies, property in the open, property of others for which the insured is legally liable, personal property of directors, officers or employees of the Insured.

b)   Any property adjusted on other than repair or replacement per the Valuation clauses of this Policy.

c)   Any loss recoverable elsewhere in this Policy.

## 17. Land and Water Clean Up Expense

This Policy covers the reasonable and necessary costs to remove, dispose of or clean up the actual but not the suspected presence of **contaminant(s)** from uninsured land or water or any substance in or on land, at a **location**, when such property is contaminated as a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to clean up, remove and dispose of **contamination** from such property:

a)   At any **location** insured for Personal Property only.

b)   When the Insured fails to give written notice of loss to this Company within 180 days after the inception of the loss.

## 18. Locks and Keys

This Policy covers the reasonable and necessary cost incurred by the Insured to replace undamaged keys and to replace, adjust or reprogram undamaged locks to accept new keys or entry codes as a result of insured physical loss or damage.

Case ID: 210200529

 

## 19. Money and Securities

This Policy covers physical loss or damage to money and securities at a **location** resulting from:

**a)**  Fire, explosion or sprinkler leakage.

## 20. Newly Acquired Property

This Policy covers property of the type insured that is newly acquired while located anywhere within this Policy's Territory, excluding while in transit.

This coverage terminates:

**a)**  When the newly acquired property is bound by this Company; or

**b)**  When agreement is reached that the property will not be insured under this Policy; or

**c)**  120 days after the date of acquisition of the property; or

**d)**  At the termination or expiration of this Policy;

Whichever occurs first.

## 21. Off-Premises Data Services - Property Damage

This Policy covers insured physical loss or damage to insured property at a **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services.
For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional General Conditions:

1)  The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2)  The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Off Premises Data Services - Property Damage Exclusions: As respects Off-Premises Data Services - Property Damage , the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 22. Off-Premises Service Interruption - Property Damage

This Policy covers insured physical loss or damage at a **location** caused by or resulting from the interruption, in whole or part, of incoming electric, gas, fuel, steam, water, refrigeration, or outgoing sewerage.

Case ID: 210200529





The interruption of such services must be by reason of an accidental event, not otherwise excluded by this Policy, at the facilities of the service provider(s) while anywhere within this Policy's Territory.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional Conditions:

This Company will not be liable for deliberate act(s) by the service provider to shed load to maintain system integrity.

Off-Premises Service Interruption - Property Damage Exclusion: As respects Off-Premises Service Interruption - Property Damage the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 23. Professional Fees

This Policy covers the reasonable and necessary expenses incurred by the Insured of:

**a)** Auditors;

**b)** Accountants;

**c)** Architects;

**d)** Engineers; or

**e)** Other professionals; and

**f)** The Insured's own employees,

For producing and certifying particulars or details to determine the amount of loss payable under this Policy for which this Company has accepted liability.

This coverage does not include the fees and expenses of attorneys, public adjusters, loss appraisers, loss consultants or any of their subsidiaries or related or associated entities.

## 24. Property Removed from a Location

This Policy covers insured property when removed from a **location** to avoid or prevent immediately impending insured physical loss or damage to such property. This Policy covers such property for physical loss or damage as provided at the **location** from which the property was removed.

This coverage applies for a period:

**a)** Of 120 days from the date of removal; but

**b)** Not beyond the termination or expiration date of this Policy.

## 25. Protection and Preservation of Property - Property Damage

This Policy covers the reasonable and necessary costs incurred for:

Case ID: 210200529




**a)** Actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

**b)** Fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

**c)** Restoring and recharging fire protection systems following an insured loss.

**d)** The water used for fighting a fire in, on or exposing the insured property.

**e)** Temporary security for a period of time not to exceed 30 consecutive days due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

This coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by the Terrorism coverage of this Policy.

This coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## 26. Tax Treatment

This Policy covers the increased tax liability as a direct result of insured physical loss or damage to insured property. When such tax liability is greater than the tax liability that would have been incurred had there been no such loss or damage, then this Policy will cover only the increased tax liability for the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured and/or the profit portion of the Business Interruption loss payment.

## 27. Tenants Legal Liability

This Policy covers direct physical loss or damage, caused by or resulting from **named perils**, to that part of buildings of others, including permanently attached building fixtures, leased to and occupied by the Insured at a **described location** to the extent of the Insured's legal liability for such loss or damage.

This coverage also includes the following:

**a)** The reasonable expenses of defending the Insured against only that part of any suit alleging the Insured's legal liability for such physical loss or damage;

**b)** The reasonable expenses incurred by this Company, this Company's proportionate share of costs taxed against the Insured in any such suit, and this Company's proportionate share of interest accruing after entry of judgment until this Company has paid, tendered or deposited into court its proportionate share of such judgment; and

**c)** The reasonable expenses, other than loss of earnings, incurred at this Company's request.

This coverage does not include:

**a)** That part of any settlement by the Insured to which this Company has not given its prior written consent; or

**b)** Any legal liability for loss or damage assumed by the Insured under any contract or agreement, whether oral or written, expressed or implied.

Additional Provisions: This Company may:

**a)** Investigate, negotiate and settle any claim or suit as this Company deems expedient and will not be prejudiced under this coverage for failure to settle for any amount within the Company's applicable limit of liability.

© 2017 AFM. All rights reserved.

Case ID: 210200529




b) Pay, tender or deposit into court the Company's applicable limit of liability, less any expenses incurred by the Company, in full satisfaction of its liability under this coverage, and thereby terminate any further liability for any expense amount described in paragraphs a, b or c above.

Tenants Legal Liability Exclusion: As respects Tenants Legal Liability, the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 28. Terrorism

This Policy covers physical loss or damage caused by or resulting from **terrorism** only at a **described location**.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this coverage are excluded from coverage elsewhere in this Policy.

This coverage does not cover loss or damage which also comes within the terms of either Group I Item 2a or Group I Item 2c of the Exclusions clause of this Policy.

This coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

a) That involves the use, release or escape of nuclear materials or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination or that involves the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act; or

b) That is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

c) In which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

d) That involves action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.

## 29. Transit

This Policy covers the following insured personal property:

a) Owned by the Insured;

b) Of others to the extent of the Insured's interest or legal liability while in the actual or constructive custody of the Insured;

c) Shipped to others on Free on Board (FOB), Cost and Freight (C&F) or similar terms. The Insured's contingent interest in such shipments is admitted,

d) Of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

Case ID: 210200529





**i)** When shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer;

**ii)** When shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer,

While in transit within the Policy's Territory:

**a)** From the time the property leaves the original point of shipment for transit; and

**b)** Continuously in the due course of transit until delivered at the destination.

**c)** Coverage on export shipments not insured under ocean cargo policies does not extend beyond the time when the property is loaded on board overseas vessels or aircraft. Coverage on import shipments not insured under ocean cargo policies does not attach until after discharge from overseas vessels or aircraft.

This coverage:

**a)** Insures physical loss or damage caused by or resulting from:

**i)** Unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts by the Insured or the Insured's agent, customer or consignee.

**ii)** Any unauthorized person(s) representing themselves to be the proper party(ies) to receive the property for shipment or to accept it for delivery.

**b)** Covers general average and salvage charges on shipments covered while waterborne.

Additional Conditions:

**a)** Permission is granted to the Insured, without prejudice to this insurance, to accept ordinary bills of lading used by carriers, including:

**i)** Released and/or undervalued bills of lading; or

**ii)** Shipping or messenger receipts.

**b)** The Insured may waive subrogation against railroads under sidetrack agreements.

**c)** The Insured may not enter into any special agreement with carriers releasing them from their common law or statutory liability.

**d)** This coverage shall not inure directly or indirectly to the benefit of any carrier or bailee.

Transit Exclusions: As respects Transit, the following additional exclusions apply:

This Policy excludes:

**a)** Property shipped by mail.

**b)** Shipments by air unless made by regularly scheduled airlines.

**c)** Waterborne shipments via the Panama Canal or waterborne shipments to and from:

**i)** Alaska.

Case ID: 210200529





    **ii)**  Hawaii.

    **iii)**  Commonwealth of Puerto Rico.

    **iv)**  Virgin Islands.

**d)**  Any transporting vehicle.

**e)**  Property of others, including the Insured's legal liability, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

**f)**  Property insured under any import or export ocean marine insurance.

Transit Valuation: On property insured under this coverage, the loss amount will not exceed the following:

**a)**  For property shipped to or for the account of the Insured: the actual invoice to the Insured, including such costs and charges (including the commission of the Insured as selling agent) as may have accrued and become legally due on such property.

**b)**  For property that has been sold by the Insured and shipped to or for the account of the purchaser (if covered by this Policy), the amount of the Insured's selling invoice, including prepaid or advanced freight.

**c)**  For property not under invoice:

    **i)**  For property of the Insured, at the valuation provisions of the Policy applying at the place from which the property is being transported; or

    **ii)**  For other property, the **actual cash value** at point of destination on the date of loss,

Less any charges saved which would have become due and payable upon arrival at destination.

## 30. Unnamed Property

This Policy covers insured property anywhere within this Policy's Territory, excluding property while in transit.

Unnamed Property Exclusion: As respects Unnamed Property, the following additional exclusion applies:

This Policy excludes:

**a)**  **Transmission and distribution systems**, except at a premises owned, leased or rented by the Insured**.**

© *2017 AFM. All rights reserved.*
Case ID: 210200529

 

# BUSINESS INTERRUPTION

The Business Interruption loss, as provided in the Business Interruption Coverage and Business Interruption Coverage Extensions of this section, is subject to all the terms and conditions of this Policy including, but not limited to, the limits of liability, deductibles and exclusions shown in the Declarations section.

## A. LOSS INSURED

This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:

1.  To property as described elsewhere in this Policy and not otherwise excluded by this Policy;

2.  Used by the Insured;

3.  While at a **location** or while in transit as provided by this Policy; and

4.  During the Period of Liability as described elsewhere in this Policy.

This Policy insures Business Interruption loss only to the extent it cannot be reduced through:

1.  The use of any property or service owned or controlled by the Insured;

2.  The use of any property or service obtainable from other sources;

3.  Working extra time or overtime; or

4.  The use of inventory;

All whether at a **location** or at any other premises. This Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the amount of loss.

In determining the amount of loss payable, this Company will consider:

1.  Any amount recovered elsewhere under this Policy for loss or damage to finished goods or merchandise at selling price as having been sold to the Insured's regular customers and credited against net sales.

2.  The experience of the business before and after and the probable experience during the Period of Liability. The probable experience will also consider any increase or decrease in demand for the Insured's goods or services during the Period of Liability, even if such increase or decrease is from the same event that caused physical loss or damage starting the Period of Liability.

3.  The continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or business operations or services.

This Policy also covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss is reduced.




# B. <u>BUSINESS INTERRUPTION COVERAGE</u>

## 1. Gross Earnings

The recoverable Gross Earnings loss is the actual loss sustained by the Insured of **Gross Earnings**, less all charges and expenses that do not necessarily continue, plus all other earnings derived from the operations of the business, excluding loss covered under Rental Income, during the Period of Liability.

**Gross Earnings** means:

The net sales value of production or business operations or services less the cost of:

**a)**  Raw stock;

**b)**  Materials and supplies; and

**c)**  Merchandise sold;

Used in production or business operations or services rendered by the Insured

The recoverable Gross Earnings loss payable is limited to the extent the Insured is:

**a)**  Wholly or partially prevented from producing goods or continuing business operations or services;

**b)**  Unable to make up lost production within a reasonable amount of time, not limited to the period during which production is interrupted;

**c)**  Unable to continue such operations or services during the Period of Liability; and

**d)**  Able to demonstrate a loss of sales for the production or business operations or services prevented.

## 2. Gross Profits

The recoverable Gross Profits loss is the actual loss sustained by the Insured of the:

**a)**  **Reduction in Sales;** and the

**b)**  **Increased Cost of Doing Business,**

Resulting from the necessary interruption of business during the Period of Liability.

As respects Gross Profits, Business Interruption Exclusion Items 2a, 2c and 3 do not apply.

For purposes of measuring the loss:

**Gross Profits** means:

The sum produced by adding the **Net Profit** to the **Insured Fixed Charges**. If there is no **Net Profit** the amount of all **Insured Fixed Charges** less that proportion of any loss from business operations as the amount of the **Insured Fixed Charges** bears to all fixed charges.

**Increased Cost of Doing Business** means:

Case ID: 210200529





The reasonable and necessary costs incurred to avoid or diminish a reduction in sales but not to exceed the sum produced by applying the **Rate of Gross Profit** to the amount of the reduction avoided; all less any sums saved as may cease or be reduced during the Period of Liability.

**Insured Fixed Charges** means:

All fixed charges unless specifically excluded in the Declarations section.

**Net Profit** means:

The net operating profit excluding:

**a)** Capital receipts and accruals; and

**b)** Outlay properly chargeable to capital;

Resulting from the business of the Insured after due provision has been made for all fixed charges and any other expenses, including depreciation, but before deduction of any taxes on profits.

**Rate of Gross Profit** means:

The rate of **Gross Profit** earned on **Sales** during the twelve (12) full months immediately before the date of the loss or damage to the insured property.

**Reduction in Sales** means:

The amount produced by applying the **Rate of Gross Profit** to the amount by which the **Sales** during the Period of Liability fall short of the **Standard Sales**.

**Sales** means:

The money, excluding loss covered under Rental Income, paid or payable to the Insured for:

**a)** Goods sold and delivered; and

**b)** Services rendered;

In the conduct of the Insured's business**.**

**Standard Sales** means:

The **Sales** during the period of the twelve (12) months immediately before the date of the loss or damage to the insured property which corresponds with the Period of Liability.

## 3. Rental Income

The recoverable Rental Income loss is the actual loss sustained by the Insured of the following during the Period of Liability:

**a)** The fair rental value of any portion of the property occupied by the Insured;

**b)** Income reasonably expected from the rentals of unoccupied or unrented portions of such property;

**c)** The rental income from the rented portions of such property, according to bona fide leases, contracts or agreements, in force at the time of loss;

Case ID: 210200529





All less charges and expenses that do not continue.

Rental Income Exclusion: As respects Rental Income, the following additional exclusion applies:

This Policy does not insure:

**a)**   Any loss of rental income during any period in which the insured property would not have been rented for any reason other than an insured loss.

## 4.   Extra Expense

The recoverable Extra Expense loss is the reasonable and necessary extra expense incurred by the Insured of the following during the Period of Liability to:

**a)**   Temporarily continue as close to normal the conduct of the Insured's business; and

**b)**   Temporarily use the property or facilities of the Insured or others;

All less any value remaining at the end of the Period of Liability for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the BI Select clause, the Period of Liability for Extra Expense coverage will be the Period of Liability applicable to the Business Interruption Coverage option selected.

Extra Expense Exclusions: As respects Extra Expense, the following additional exclusions apply:

This Policy does not insure:

**a)**   Any loss of income.

**b)**   Expenses that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

**c)**   The cost of permanent repair or replacement of property that has been damaged or destroyed.

**d)**   Any expense recoverable elsewhere in this Policy.

## 5.   BI Select™

If this Policy insures Gross Earnings and Gross Profit the Insured has the option to make claim based on either:

**a)**   Gross Earnings; or

**b)**   Gross Profit.

If such claim involves more than one **location**, including interdependency at one or more **locations**, all such claims will be adjusted using the coverage option chosen above.

This option may be exercised any time prior to meeting the conditions set forth in the Settlement of Claims provisions in the Loss Adjustment and Settlement section of this Policy.

© *2017 AFM. All rights reserved.*

Case ID: 210200529





## C. <u>PERIOD OF LIABILITY</u>

The Period of Liability for Business Interruption Coverage and Business Interruption Coverage Extensions, unless otherwise stated elsewhere in this Policy, is as follows:

The Gross Earnings, Rental Income or Extra Expense Period of Liability is:

1.  The period starting from the time of physical loss or damage of the type insured; and

2.  Ending when, with due diligence and dispatch,

    a)  The lost or damaged property could be repaired or replaced and made ready for production or business operations or services under the same or equivalent physical operating conditions that existed prior to the loss or damage; or

    b)  The lost or damaged property under the course of construction or renovation could be repaired or replaced to the same or equivalent degree of completion that existed prior to the loss or damage. This period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened.

3.  For **raw materials** or supplies, the period of time:

    a)  Resulting from the inability to procure suitable **raw materials** or supplies to replace those physically lost or damaged, but

    b)  For no more than the period of time for which such physically lost or damaged **raw materials** or supplies would have supplied production or business operating or servicing needs.

The Gross Profit Period of Liability is:

The period starting from the time of physical loss or damage of the type insured and ending no later than the period of time shown in the Declarations section during which the results of the business shall be directly affected by such damage.

Period of Liability Conditions:

The Period of Liability will not include any additional time:

1.  Due to the Insured's inability to resume production or business operations or services regardless of the reason, including but not limited to:

    a)  Making change(s) to the buildings, structures or equipment, for any reason except as provided by the Demolition and Increased Cost of Construction coverage in this Policy; or

    b)  Restaffing or retraining employees. However, this item does not apply to additional time needed to train staff to use new machinery or equipment which replaces machinery or equipment that suffered insured physical loss or damage, provided that such training is completed within 90 days after the new machinery or equipment has been installed.

If two or more Periods of Liability apply such periods will not be cumulative and will not be limited by the expiration of this Policy.

## D. <u>BUSINESS INTERRUPTION EXCLUSIONS</u>

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Business Interruption loss:

This Policy does not insure:

Case ID: 210200529

 

1. Any loss during any idle period, including but not limited to when production, operations or services or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

   a) Physical loss or damage not insured by this Policy.

   b) Planned or rescheduled shutdown.

   c) Strike or other work stoppage.

   d) Any other reason other than physical loss or damage insured under this Policy.

2. Any increase in loss due to:

   a) The suspension, cancellation, or lapse of any lease, contract, license or order.

   b) Damages for breach of contract, or for late or non-completion of orders.

   c) Fines or penalties of any nature, except as provided by the Contractual Penalties coverage in this Policy.

   d) Any other consequential or remote loss.

3. Any loss resulting from physical loss or damage to merchandise or finished goods valued at the regular cash selling price or the time required for their reproduction.

4. Any loss resulting from the actual cash value portion of direct physical loss or damage by fire caused by or resulting from terrorism.

# E. <u>BUSINESS INTERRUPTION COVERAGE EXTENSIONS</u>

## 1. Attraction Property

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to a **described location** and is within one (1) statute mile of the **described location**.

Attraction Property Exclusion: As respects Attraction Property, the following additional exclusion applies:

This Policy does not insure loss resulting from:

   a) Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to loss.

## 2. Civil or Military Authority

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

The Period of Liability for this Business Interruption Coverage Extension will be:

Case ID: 210200529




a)  The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy.

## 3.  Communicable Disease - Business Interruption

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a)  An order of an authorized governmental agency regulating such presence of **communicable disease**; or

b)  A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such **described location** with such presence of **communicable disease**.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Communicable Disease - Business Interruption Exclusions: As respects Communicable Disease - Business Interruption, the following additional exclusions apply:

This Policy does not insure loss resulting from:

a)  The enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

b)  Loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

a)  Starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but

b)  Not to exceed the time limit shown in the Limits of Liability clause in the Declarations section,

This period of time is part of and not in addition to any Period of Liability applying to any coverage provided in the Business Interruption section.

## 4.  Computer Systems Non-Physical Damage

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from:

a)  The failure of the Insured's **electronic data processing equipment or media** to operate provided that such failure is the direct result of a malicious act directed at the Named Insured; or

b)  The Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending malicious act directed at the Named Insured, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

While anywhere within this Policy's Territory.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

© 2017 AFM. All rights reserved.

Case ID: 210200529





The Period of Liability for this Business Interruption Coverage Extension will be:

**a)** The period of time starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when, with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure; and

**b)** Does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

## 5. Contractual Penalties

This Policy covers contractual penalties incurred by the Insured during the Period of Liability due to late or non-completion of orders as a direct result of insured physical loss or damage to property of the type insured**.**

This extension of coverage applies provided that such contractual penalties:

**a)** Are written in the provisions of a contract prior to the time of such direct physical loss or damage, and

**b)** Will be limited to the contractual sales value of such late or non-completed orders.

## 6. Crisis Management

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **described location,** provided such order is a direct result of:

**a)** A violent crime, suicide, attempted suicide or armed robbery; or

**b)** A death or bodily injury caused by a **workplace accident**;

At that **described location.**

For the purpose of this Business Interruption Coverage Extension only, a violent crime, suicide, attempted suicide or armed robbery at a **described location** will be considered direct physical loss or damage insured by this Policy.

Crisis Management Exclusion: As respects Crisis Management, the following additional exclusion applies:

This Policy does not insure loss resulting from:

**a)** Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

**a)** The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy.

## 7. Extended Period of Liability

The Gross Earnings and Rental Income coverage is extended to cover the reduction in sales resulting from:

**a)** The interruption of business as covered by Gross Earnings or Rental Income;

**b)** For such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and

© *2017 AFM. All rights reserved.*

Case ID: 210200529




**c)** Commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Business Interruption Coverage Extension had not been included in this Policy.

However, this Business Interruption Coverage Extension does not apply to Gross Earnings or Rental Income loss resulting from physical loss or damage caused by or resulting from **terrorism**.

As respects Extended Period of Liability, Business Interruption Exclusion Item 2a does not apply.

Coverage under this Business Interruption Coverage Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Business Interruption Coverage Extension does not apply for more than the number of consecutive days shown in the Limits of Liability clause of the Declarations section of this Policy.

## 8. Ingress/Egress

This Policy covers the Business Interruption Coverage loss incurred by the Insured due to the necessary interruption of the Insured's business when ingress to or egress from a **described location(s)** is physically prevented, either partially or totally, as a direct result of physical loss or damage of the type insured to property of the type insured whether or not at a **described location**.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

Ingress/Egress Exclusion: As respects Ingress/Egress, the following additional exclusion applies:

This Policy does not insure loss resulting from:

**a)** Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

## 9. Leasehold Interest

This Policy covers the loss incurred by the Insured of Leasehold Interest as follows:

If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the **Lease Interest** for the first three months following the loss; and the **Net Lease Interest** for the remaining unexpired term of the lease. Leasehold Interests Exclusions: As respects Leasehold Interest, the following applies:

**a)** Business Interruption Exclusions 1, 2 and 3 do not apply and the following applies instead:

This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

**b)** This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

As used above, the following terms mean:

**Net Lease Interest:**

Case ID: 210200529




That sum which placed at 6 percent interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

**Lease Interest:**

The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

## 10. Logistics Extra Cost

This Policy covers the extra cost incurred by the Insured during the Period of Liability due to disruption of the normal movement of goods or materials:

**a)** Directly between **described locations**; or

**b)** Directly between a **location** and the premises of a direct supplier, direct customer or direct contract service provider to the Insured;

Provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured within the Policy's Territory.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

**a)** Extra costs to temporarily continue as close to normal the movement of goods or materials.

Logistics Extra Cost Exclusions: As respects Logistics Extra Cost, the following shall apply:

This Policy does not insure any loss resulting from:

**a)** Disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

**b)** Disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

**c)** Disruption caused by physical loss or damage to personal property of the Insured while in transit.

**d)** Disruption in the movement of goods or materials between the premises of a supplier, customer or contract service provider to the Insured and the premises of another supplier, customer or contract service provider to the Insured.

**e)** Costs that usually would have been incurred in conducting the business during the same period had there been no disruption of normal movement of goods or materials; or

**f)** Loss of income

**g)** Costs of permanent repair or replacement of property that has been damaged or destroyed.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

**a)** Starting at the time of physical loss or damage causing the disruption of the normal movement of goods or materials; and

Case ID: 210200529




b) Ending not later than when with due diligence and dispatch the normal movement of goods or materials could be resumed.

## 11. Off-Premises Data Services - Business Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at a **location** of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services. For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional General Conditions:

a) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

b) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover the Business Interruption Coverage loss incurred by the Insured covered by Computer Systems Non-Physical Damage coverage as provided in this section of this Policy.

Off-Premises Data Services - Business Interruption Exclusions: As respects Off- Premises Data Services - Business Interruption, the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

As used above, Period of Liability of **off-premises data processing or data transmission services**:

a) Is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the Period of Liability clause in this section.

b) Is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

c) Does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## 12. Off-Premises Service Interruption - Business Interruption

This Policy covers Business Interruption Coverage loss incurred by the Insured during the Period of Liability caused by the interruption, in whole or part, of incoming electric, gas, fuel, steam, water, refrigeration, and outgoing sewerage services at a **location**.

The interruption of such services must be by reason of any accidental event, not otherwise excluded by this Policy, at the facilities of the service provider(s) while anywhere within this Policy's Territory.




This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional Conditions:

This Company will not be liable for deliberate act(s) by the supplying utility to shed load to maintain system integrity.

Off-Premises Service Interruption - Business Interruption Exclusion: As respects Off-Premises Service Interruption - Business Interruption the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

**a)** The period starting with the time when an interruption of specified services happens; and

**b)** Ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations under the same or equivalent physical and operating conditions. Resultant and concurrent interruptions are considered as one event.

## 13. Protection and Preservation of Property - Business Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

This Business Interruption Coverage Extension does not cover loss sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by Terrorism coverage as provided in this Policy.

This Business Interruption Coverage Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## 14. Research and Development

Gross Earnings and Gross Profits coverages are extended to cover the actual loss sustained by the Insured of continuing fixed charges and **ordinary payroll** directly attributable to the interruption of research and development activities that in themselves would not have produced income during the Period of Liability.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

**a)** Starting at the time of physical loss or damage of the type insured; and

**b)** Ending when the property could be repaired or replaced and made ready for operations.

## 15. Soft Costs

This Policy covers **soft costs** incurred by the Insured during the Period of Liability arising out of the delay in the completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at **locations**.

Case ID: 210200529





## 16. Supply Chain

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured at the premises of any of the following within the Policy's Territory:

**a)**   Direct suppliers, direct customers or direct contract service providers to the Insured;

**b)**   Any company under any royalty, licensing fee or commission agreement with the Insured; or

**c)**   Any company that is a direct or indirect supplier, customer or contract service provider of those described in **a)** above,

But not at the premises of entities directly or indirectly supplying to or receiving from a **location** electricity, fuel, water, steam, refrigeration, sewerage, voice, data or video.

Business Interruption Coverage loss recoverable under this Business Interruption Coverage Extension is extended to include the following Business Interruption Coverage Extensions:

**a)**   Civil or Military Authority

**b)**   Crisis Management

**c)**   Extended Period of Liability

**d)**   Ingress/Egress

**e)**   Off-Premises Service Interruption - Business Interruption

**f)**   Supply Chain

Supply Chain Exclusions: As respects Supply Chain coverage, the following additional exclusion applies:

This Policy does not insure loss resulting from:

**a)**   Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

Case ID: 210200529

 

# LOSS ADJUSTMENT AND SETTLEMENT

## A. ABANDONMENT

There shall be no abandonment to this Company of any property.

## B. APPRAISAL

If the Insured and this Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

**1.** The Insured has fully complied with all provisions of this Policy.

**2.** This Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire. If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or this Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for Business Interruption loss, the amount of loss for each Business Interruption coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any two will determine the amount of loss.

The Insured and this Company will each:

**1.** Pay its chosen appraiser; and

**2.** Bear equally the other expenses of the appraisal and umpire.

A demand for Appraisal shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under Requirements in Case of Loss.

This Company will not be held to have waived any of its rights by any act relating to appraisal.

## C. COLLECTION FROM OTHERS

This Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## D. COMPANY OPTION

This Company has the option to take all or any part of damaged property at the agreed or appraised value. This Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.

## E. CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America, except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the First Named Insured.





# F.  LEGAL ACTION AGAINST THIS COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

**1.**   The Insured has fully complied with all the provisions of this Policy; and

**2.**   Legal action is started within two years after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such two-year limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.

# G.  LOSS ADJUSTMENT AND PAYABLE

Loss or damage will be adjusted with the First Named Insured and payable to or as the First Named Insured directs subject to the Mortgagee/Lenders Loss Payable clause in the General Conditions section of this Policy.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee on a Certificate of Insurance issued by this Company prior to the loss.

When named on a Certificate of Insurance issued by the Insured's broker with this Company's permission, such additional interests are added to this Policy as their interests may appear when such Certificate of Insurance is issued prior to the loss and on file with this Company. The effective date of any such interest will be the issue date of the certificate unless a later date is specified on the Certificate of Insurance. The Certificate of Insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

# H.  OTHER INSURANCE

**1.**   If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

**2.**   In no event will this Policy apply as contributing insurance.

**3.**   The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy. The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy. Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

**4.**   The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy. The existence of such other insurance will not prejudice recovery under this Policy. If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

**5.**   If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each **location**, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest **location** value on file with this Company.

# I.  REQUIREMENTS IN CASE OF LOSS

The Insured will:

**1.**   Give immediate written notice to this Company of any loss.

**2.**   Protect the property from further loss or damage.

Case ID: 210200529





3. Promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

4. Give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by this Company. The proof of loss must state the knowledge and belief of the Insured as to:

   a) The time and origin of the loss.

   b) The Insured's interest and that of all others in the property.

   c) The **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d) Any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e) By whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5. Include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6. Further, the Insured, will as often as may be reasonably required:

   a) Exhibit to any person designated by the Company all that remains of any property;

   b) Submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

   c) Produce for examination at the request of the Company:

      i) All books of accounts, business records, bills, invoices and other vouchers; or

      ii) Certified copies if originals are lost,

   At such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## J. <u>SETTLEMENT OF CLAIMS</u>

The amount of loss for which this Company may be liable will be paid within 30 days after:

1. Proof of loss as described in this Policy is received by this Company; and

2. When a resolution of the amount of loss is made either by:

   a) Written agreement between the Insured and this Company; or

   b) The filing with this Company of an award as provided in the Appraisal clause of this section.

In the event of insured physical loss or damage determined by this Company's representatives to be in excess of the applicable policy deductible, this Company will advance mutually agreed-upon partial payment(s), subject to the Policy's

Case ID: 210200529

 

provisions. To obtain such partial payments, the Insured will submit a signed and sworn proof of loss as described in this Policy, with adequate supporting documentation.

## K. <u>SUBROGATION</u>

The Insured shall cooperate in any subrogation proceedings. This Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of this Company's payment.

This Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss. No such waiver will affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by this Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1.   Any applicable deductible; and/or

2.   Any provable uninsured loss,

Bears to the entire provable loss amount.

## L. <u>VALUATION</u>

Adjustment of the physical loss amount(s) under this Policy will be as of the date of loss at the place of loss, and for no more than the interest of the Insured.

1.   Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy:

   a)   The cost to repair.

   b)   The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

   c)   The cost to rebuild, repair or replace on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

   d)   On real property or machinery and equipment, other than stock, offered for sale on the date of the loss, the selling price.

2.   On **raw materials**, supplies and merchandise not manufactured by the Insured, the replacement cost.

3.   On **stock in process**, the value of **raw materials** and labor expended plus the proper proportion of overhead charges.

4.   On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which such finished goods would have been subject had no loss happened.

5.   On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from backup or from originals of a previous generation. These costs will not include research, engineering or any costs of restoring or recreating lost information.

6.   On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss. Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) of the Policy and shall be subject to the limit(s) of liability for Terrorism, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the Limits of Liability clause in the Declarations section.

© *2017 AFM. All rights reserved.*
Case ID: 210200529


Member of the FM Global Group



7. On personal property that is part of a pair or set, and the physically damaged personal property cannot be replaced or repaired, the reduction in value of the undamaged portion of insured personal property. If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such property to this Company.

8. On unrepairable electrical or mechanical equipment, including computer equipment, the cost to replace such equipment with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

9. On property scheduled for demolition, the increased cost of demolition, if any, directly resulting from insured loss.

10. On improvements and betterments, the unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

11. On property that is useless to the Insured, the **actual cash value.**

12. On property if not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company, the **actual cash value**.

The Insured may elect not to repair or replace the insured real or personal property under Item 1 above that is lost, damaged or destroyed. Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss. As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at a **described location** under this Policy. This item does not extend to Demolition and Increased Cost of Construction.

© 2017 AFM. All rights reserved.
Case ID: 210200529

 

# GENERAL CONDITIONS

## A. APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows:

1.  This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property. This Policy does not pay for any business interruption loss resulting from the foregoing remediation, change, correction, repair or assessment.

2.  Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage. This Policy does not pay for any such incident or for any business interruption loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000. Such covered resulting physical loss or damage does not include any loss, cost or expense described in a) or b) above. If such covered resulting physical loss or damage happens, and if this Policy provides business interruption coverage, then, subject to all of its terms and conditions, this Policy also covers any insured business interruption loss directly resulting therefrom.

## B. CANCELLATION/NON-RENEWAL

This Policy may be:

1.  Cancelled at any time at the request of the First Named Insured by surrendering this Policy to this Company or by giving written notice to this Company stating when such cancellation will take effect; or

2.  Cancelled by this Company by giving the First Named Insured not less than:

    a)  60 days written notice of cancellation; or

    b)  10 days written notice of cancellation if the First Named Insured fails to remit, when due, payment of premium for this Policy; or

3.  Non-renewed by this Company by giving the First Named Insured not less than 60 days written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the First Named Insured cancels and on a pro-rata basis if the Company cancels this Policy. Return of any unearned premium will be made by the Company as soon as practicable.

## C. CONFORMITY TO STATUTE

Terms of this Policy that conflict with the statutes of the jurisdiction where the insured property is located, are amended to conform to such statutes.

## D. FIRST NAMED INSURED

The First Named Insured shown in the Declarations section:

Case ID: 210200529

 

1. Is responsible for the payment of all premiums.

2. Will be the payee for any return premiums.

3. May authorize changes in the terms and conditions of this Policy with the consent of this Company.

## E. <u>INCREASE IN HAZARD</u>

This Policy will not apply to any **location** where there is an increase in hazard over which the Insured has control and knowledge. Any increase in hazard at one or more **locations** will not affect coverage at other **locations** where, at the time of loss or damage, the increase in hazard does not exist.

## F. <u>INSPECTIONS</u>

This Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property. This Company does not address life, safety or health issues.

This Company's:

1. Right to make inspections; or

2. Making of inspections; or

3. Providing recommendations or other information in connection with any inspections,

Will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.

This Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When this Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.

## G. <u>LIBERALIZATION CLAUSE</u>

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

## H. <u>MISREPRESENTATION AND FRAUD</u>

This entire Policy will be void if, whether before or after a loss, an Insured has:

1. Willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

2. Made any attempt to defraud this Company.

3. Made any false swearing.




# I. MORTGAGEE/LENDERS LOSS PAYABLE

Loss or damage, if any, to specified property insured under this Policy shall be payable to each specified Lenders Loss Payable (hereinafter referred to as Lender) and specified Mortgagee as its interest may appear.

This insurance as to the interest of the Lender or Mortgagee shall not be invalidated by:

**1.** Any act or neglect of the debtor, mortgagor or owner (as the case may be) of the property.

**2.** Foreclosure, notice of sale or similar proceedings with respect to the property.

**3.** Change in the title or ownership of the property.

**4.** Change to a more hazardous occupancy.

The Lender or Mortgagee will notify this Company of any known change in ownership, occupancy or hazard and, within 10 days of written request by this Company, may pay the increased premium associated with such known change. If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

If the Insured fails to render proof of loss within the time provided in this Policy, the Lender or Mortgagee shall render proof of loss within sixty days after having knowledge of the Insured's failure in the form and manner provided by this Policy, and, further, shall be subject to the provisions of this Policy relating to Appraisal, Legal Action Against this Company, and Settlement of Claims.

If this Policy is cancelled at the request of the First Named Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

**1.** Sooner terminated by authorization, consent, approval, acceptance or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

**2.** This Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

This Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 60 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment. If the debtor, mortgagor or owner has failed to pay any premium due under this Policy, this Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation. If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

Whenever this Company shall pay the Lender or Mortgagee for loss or damage under this Policy and shall deny payment to the debtor, mortgagor or owner, this Company shall, to the extent of such payment, be subrogated to the rights of the Lender or Mortgagee under all collateral held to secure the debt or mortgage. No subrogation shall impair the right of the Lender or Mortgagee to recover the full amount due. At its option, this Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest. In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to this Company, and the remaining debt or mortgage will be paid to this Company.

This Company may invoke this Policy's Suspension clause. The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel subject to the suspension. This Company will provide the Lender or Mortgagee at the last reported address a copy of the suspension notice.

All notices sent to the Lender shall be sent to its last reported address.

© *2017 AFM. All rights reserved.*

Case ID: 210200529





Other provision relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## J. <u>POLICY MODIFICATION</u>

This Policy contains all of the agreements between the Insured and the Company concerning this insurance. The Insured and the Company may request changes to this Policy. This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

1. Create a waiver, or change any part of this Policy; or

2. Prevent the Company from asserting any rights under the provisions of this Policy.

## K. <u>REINSTATEMENT OF LIMITS AFTER A LOSS</u>

Except for an **annual aggregate** limit of liability, any loss or payment of any claim will not reduce the amount payable under this Policy.

## L. <u>SUSPENSION</u>

Upon discovery of a dangerous condition, this Company may immediately suspend the **boiler and machinery** insurance with respect to any machine, vessel or part thereof by giving written notice to the Insured. The insurance that is suspended may be reinstated by this Company. The Insured will be allowed the return of the unearned portion of the premium resulting from the suspension of insurance.

## M. <u>TRANSFER OF RIGHTS AND DUTIES UNDER THIS POLICY</u>

The Insured's rights, interests and duties under this Policy may not be transferred or assigned without this Company's written consent.

Case ID: 210200529





# DEFINITIONS

**actual cash value** means the cost to repair or replace the property, on the date of the loss or damage, with material of like kind and quality, less proper deduction for obsolescence and physical depreciation.

**annual aggregate** means the Company's maximum amount payable during any policy year.

**boiler and machinery** means:

1. Direct physical loss or damage originating within:

   **a)** Boilers, fired or unfired pressure vessels, vacuum vessels and pressure piping, all normally subject to vacuum or internal pressure other than static pressure of contents, excluding:

   **i)** Waste disposal piping;

   **ii)** Any piping forming part of a fire protective system;

   **iii)** Furnaces; and

   **iv)** Any water piping other than:

   **(a)** Boiler feed water piping between the feed pump or injector and the boiler;

   **(b)** Boiler condensate return piping; or

   **(c)** Water piping forming part of a refrigerating or air conditioning system used for cooling, humidifying or space heating purposes.

   **b)** All mechanical, electrical, electronic or fiber optic equipment;

2. And caused by, resulting from or consisting of:

   **a)** Mechanical breakdown; or

   **b)** Electrical or electronic breakdown; or

   **c)** Extremes or changes of temperature; or

   **d)** Rupture, bursting, bulging, implosion or steam explosion.

3. **boiler and machinery** as used in this Policy does not mean:

   Physical loss or damage caused by or resulting from any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

   **a)** Combustion explosions, except from within combustion gas turbines; or

   **b)** Explosions from liquids coming in contact with molten materials; or

   **c)** Accidental discharge, escape, leakage, backup or overflow to the open of any material from confinement within piping, plumbing systems or tanks except from property described in Item 1a above; or

   **d)** Fire, or from the use of water or other means to extinguish a fire.

Case ID: 210200529

 

**communicable disease** means disease which is:

1. Transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

2. Legionellosis.

**contaminant** means anything that causes **contamination.**

**contamination** means any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

**date or time recognition** means the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**described location(s)** means the locations described in the Insurance Provided clause of the Declarations section of this Policy.

**earth movement** means any natural or man-made earth movement, including but not limited to earthquake or landslide regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media** means any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

**fine arts** means paintings; etchings; pictures; tapestries; rare or art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit, excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money and securities.

**flood** means flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer backup resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss. Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

**Green** means products, materials, methods and processes certified by a **Green Authority** that conserve natural resources, reduce energy or water consumption, avoid toxic or other polluting emissions or otherwise minimize environmental impact.

**Green Authority** means an authority on **Green** buildings, products, materials, methods or processes that are certified and accepted by Leadership in Energy and Environmental Design (LEED®), Green Building Initiative Green Globes®, Energy Star Rating System or any other recognized **Green** rating system.

**irreplaceable** means an item which cannot be replaced with other of like kind and quality.

**location** means a location described in the Insurance Provided clause of the Declarations section or included as Newly Acquired Property or Unnamed Property coverages.

© 2017 AFM. All rights reserved.
Case ID: 210200529




**named perils** means: fire, lightning, **wind**, hail, explosion, smoke, impact from aircraft and vehicles, objects falling from aircraft, strike, riot, civil commotion, vandalism, theft, attempted theft, sprinkler leakage or collapse of buildings.

**occurrence** means the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

1.  **terrorism: occurrence** will mean the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by all acts of **terrorism** during a continuous period of seventy-two (72) hours.

2.  **earth movement: occurrence** will mean the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by all **earth movement(s)** during a continuous period of seventy-two (72) hours.

**off-premises data processing or data transmission services** means the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

**offshore** means away from the shore but not connected to the shore by docks, piers or any other physical connection other than pipelines.

**ordinary payroll** means:

1.  Wages of all employees except officers, executives, department managers, and employees under contract or similar key employees; and

2.  Includes taxes and charges dependent on the payment of those wages.

**physical loss or damage to electronic data, programs or software** means the destruction, distortion or corruption of electronic data, programs or software.

**production machinery and equipment** means any production or process machine(s) or apparatus that processes, forms, cuts, shapes, grinds or conveys **raw materials**, materials in process or finished goods and any associated equipment utilized in production including but not limited to electrical cabling, transformers, HVAC and any equipment or apparatus that is mounted upon or used exclusively with any one or more production or process machine(s) or apparatus.

**raw materials** mean materials and supplies in the state in which the Insured receives them for conversion by the Insured into finished goods.

**soft costs** means the expenses over and above normal expenses at **locations** undergoing alterations or additions to existing property and property in the course of construction limited to the following:

1.  Construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, and charges by the lenders for the extension or renewal of loans necessary.

2.  Commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of releasing and marketing of the Insured Project due to loss of tenant(s) or purchaser(s).

3.  Additional fees - for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

4.  Carrying costs - building permits, additional interest on loans, insurance premiums and property and realty taxes.

Case ID: 210200529

   

**stock in process** means **raw materials** or stock, which has undergone any aging, seasoning, mechanical or other process or manufacture, but which is not finished goods.

**terrorism** means:

1.  Any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

2.  When the effect or apparent purpose is:

    To influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or to further, or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

**transmission and distribution systems** means transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data and video. Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.

**valuable papers and records** means inscribed, printed or written: documents; manuscripts or records including abstracts; and, books, deeds, drawings, films, maps or mortgages, all of which must be of value to the Insured. **Valuable papers and records** are not: money, securities and stamps; converted data programs or instructions used in the Insured's data processing operations; or, materials on which data is recorded.

**wind** means direct action of wind including substance driven by wind. **Wind** does not mean or include anything defined as **flood** in this Policy.

**workplace accident** means a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

Case ID: 210200529

Case ID: 210200529

# SUPPLEMENTAL UNITED STATES
# CERTIFIED ACT OF TERRORISM ENDORSEMENT

**This Endorsement is applicable to all insured locations in the United States, its territories and possessions and the Commonwealth of Puerto Rico.**

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002, as amended.**

In consideration of a premium charged of $4,800, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting Business Interruption loss, as provided in the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein.
This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under any Sub-Limits clause in the Declarations section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed $100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed $100,000,000,000. If the aggregate insured losses for all insurers exceed $100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law.  Under this formula, the United States pays 85% (and beginning on January 1, 2016, shall then decrease by 1 percentage point per calendar year until equal to 80 percent) of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy.  The premium charged for this coverage is provided above.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

Reference and Application:  The following term(s) means:

Certified Act of Terrorism:

A "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and extended in 2005, 2007 and in 2015.
The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

    a.   The act resulted in aggregate losses in excess of $5,000,000; and

    b.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Case ID: 210200529

Case ID: 210200529




# NORTH CAROLINA

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of North Carolina this policy is amended:

**CANCELLATION**

**1.** The Company may cancel this policy or one or more of its parts by mailing or delivering to the Insured a written notice at least 15 days before the cancellation is to take effect. It will also send a notice to any mortgagee, loss payee and agent or broker of record. The notices will be sent to the addresses shown in the policy or, if not indicated in the policy, to the last addresses known to the company. The notice must state the precise reason for cancellation.

**2.** If the policy has been in effect for 60 days or more, or if it is a renewal policy issued by the Company effective immediately, it may cancel this policy only on the anniversary date, or if one or more of the following reasons apply:

    **a.** Nonpayment of premium in accordance with the policy terms;

    **b.** An act or omission by the Insured or his representative that constitutes material misrepresentation or nondisclosure of a material fact in obtaining the policy, continuing the policy, or presenting a claim under the policy;

    **c.** Increased hazard or material change in the risk assumed that could not have been reasonably contemplated by the parties at the time of assumption of risk;

    **d.** Substantial breach of contractual duties, conditions or warranties that materially affect the insurability of the risk;

    **e.** A fraudulent act against the Company by the Insured or his representative that materially affects the insurability of the risk;

    **f.** Willful failure by the Insured or his representative to institute reasonable loss control measures that materially affect the insurability of the risk after written notice by the insurer;

    **g.** Loss of facultative reinsurance, or loss of or substantial changes in applicable reinsurance as provided in the North Carolina statutes;

    **h.** Conviction of the Insured of a crime arising out of acts that materially affect the insurability of the risk; or

    **i.** A determination by the Commissioner that the continuation of the policy would place the insurer in violation of the laws of this state.

**NONRENEWAL -** If the Company decides not to renew this policy, it will mail or give you written notice of nonrenewal at least 45 days prior to the expiration date or anniversary date of the policy. The notice of nonrenewal must state the precise reason for nonrenewal. Notice is not required if you have insured elsewhere, accepted replacement coverage, or have requested or agreed to nonrenewal.

**RENEWAL WITH PREMIUM OR COVERAGE CHANGES -** If the Company intends to renew the policy with premium or coverage changes, it will mail or give you the renewal terms and a statement of the premium due at least 45 days prior to the expiration date or anniversary date of the policy.

Case ID: 210200529



**NOTICES - NONRENEWAL AND RENEWAL WITH PREMIUM OR COVERAGE CHANGES -** Notices of nonrenewal and renewal with premium or coverage changes will be sent to the Insured and to any mortgagee, loss payee and agent or broker of record at the addresses shown in the policy or, if not indicated in the policy, to the last addresses known to the Company.

**COMMENCEMENT OF LEGAL ACTION -** Legal action against this Company as provided in the policy to which this endorsement is attached, shall commence within three years after the date on which the direct physical loss or damage occurred.

Case ID: 210200529



# PENNSYLVANIA

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of Pennsylvania this policy is amended:

**CANCELLATION -** If this policy has been in effect for 60 days or more, or if it is a renewal of a policy issued by the Company effective immediately, it may cancel this policy only if one or more of the following reasons apply.

1.  A condition, factor or loss experience material to insurability has changed substantially, or a substantial condition, factor or loss experience material to insurability has become known during the policy term;

2.  Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease shall, at the time of cancellation, be certified to the Insurance Commissioner as directly affecting in-force policies;

3.  An Insured has made a material misrepresentation which affects the insurability of the risk;

4.  The policy was obtained through fraudulent statements, omissions, or concealment of fact material to the acceptance of the risk or to the hazard assumed by the company;

5.  You have failed to pay a premium when due, whether the premium is payable directly to the company or its agents or indirectly under a premium finance plan or extension of credit;

6.  Material failure to comply with policy terms, conditions or contractual duties; or

7.  Other reasons that the Insurance Commissioner may approve.

We will give the Named Insured notice of cancellation at least 60 days before the cancellation is effective, except that notice, at least 15 days before the cancellation is effective, is required for nonpayment of premium, or where an insured has made a material misrepresentation which affects the insurability of the risk.

If this policy has been in effect less than 60 days, we may cancel for any reason by giving the Named Insured notice at least 30 days before cancellation is to be effective.

The policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of fact material to the acceptance of the risk or to the hazard assumed by the company.

**NONRENEWAL -** If the Company decides not to renew this policy, it will give the Named Insured written notice at least 60 days before the end of the policy period or anniversary date.

**NOTICE –** The Company notice will include the specific reason for cancellation or nonrenewal. The notice will be mailed or delivered to the last address known to the company.  Proof of mailing will be sufficient proof of notice.

**RETURN PREMIUM -** The return premium, if any, will be refunded to the Named Insured not later than 10 business days after the effective date of the termination if we cancel this policy, or not later than 30 days after the effective date of the termination if the Named Insured cancels this policy.

**NOTICE OF INCREASED PREMIUM –** The Company will give the Named Insured notice at least 60 days before the renewal date if we intend to increase the renewal premium. It will give notice of an estimate of the renewal premium at least 30 days before the renewal date.

Case ID: 210200529



**CONSULTATION SERVICES EXEMPTION ACT -** This Company and its' agents, employees and service contractors may, for insurance purposes, make inspections or surveys or perform other consultation services to assist in reducing the possibility of loss to insured property.

This Notice is provided to the Insured pursuant to the Law of the Commonwealth of Pennsylvania, Effective January 1, 1981 and known as the "Insurance Consultation Services Exemption Act", which generally provides that "the furnishing of, or failure to furnish, insurance consultation services related to, in connection with or incidental to a policy of insurance shall not subject the insurer, its' agents, employees or service contractors to liability for damages from injury, death or loss occurring as a result of any act or omission by any person in the course of such services"

This Act does not apply:

1.  Where the injury occurred during the actual performance of consultation services and was caused by the negligence of this Company, its' agents, employees or service contractors;

2.  With respect to consultation services performed pursuant to a written service contract not incidental to a policy of insurance; and

3.  In any action against this Company, its' agents, employees or service contractors in which it is judicially determined that any act or omission by this Company, its' agents, employees or service contractors resulting in damages constituted a crime, actual malice or gross negligence.

This Notice shall be attached to and becomes a part of the Insured's policy.

Case ID: 210200529

# SOUTH CAROLINA

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of South Carolina this policy is amended:

**CANCELLATION** - If this policy has been in effect for 90 days or more or if it is a renewal of a policy issued by the Company effective immediately, it may cancel this policy only if one or more of the following reasons apply:

1. Nonpayment of premium;

2. Material misrepresentation of fact which, if known to us, would have caused us not to issue the policy;

3. Substantial change in the risk assumed, except to the extent that the company should reasonably have foreseen the change or contemplated the risk in writing the policy;

4. Substantial breaches of contractual duties, conditions, or warranties; or

5. Loss of the Company's reinsurance covering all or a significant portion of the particular policy insured, or where continuation of the policy would imperil its solvency or place us in violation of insurance laws of this State. Prior to cancellation for reasons permitted in this item (5), the company must notify the Commissioner, in writing, at least sixty days prior to such cancellation and the Commissioner shall, within thirty days of such notification, approve or disapprove such action.

**NOTICE OF CANCELLATION** – The Company will give the Named Insured written notice of cancellation at least 30 days before the cancellation is to take effect if the cancellation is for reasons other than nonpayment of premium. For nonpayment of premium it will give the Named Insured at least 10 days notice. The company notice will state the reason for cancellation.

**NONRENEWAL** - If the Company decides not to renew this policy it will mail or deliver to the Named Insured its notice of nonrenewal at least 30 days before the end of the policy period or the anniversary date. Our notice will state the reason for nonrenewal.  The Company notice of cancellation or nonrenewal will be mailed or delivered to the Named Insured's and Agent of Record, if any, at their last known addresses. Proof of mailing is sufficient proof of notice.

A policy written for a term of one year or less may be nonrenewed by the Company at its expiration date by giving or mailing written notice of nonrenewal to the Insured and the agent of record, if any, not less than 60 days prior to the expiration date of this policy for any nonrenewal that would be effective between November 1st and May 31st and not less than 90 days for any nonrenewal that would be effective between June 1st and October 31st.

A policy written for a term of more than one year or for an indefinite term may be nonrenewed by the insurer at its anniversary date by giving or mailing written notice of nonrenewal to the Insured and the agent of record, if any, not less than 60 days prior to the anniversary date of this policy for any nonrenewal that is effective between November 1st and May 31st and not less than 90 days prior to the anniversary date of this policy for any nonrenewal that is effective between June 1st and October 31st.

If this policy has been issued for a term longer than one year and for additional premium consideration renewal of the policy or an annual premium has been guaranteed, it is unlawful for the Company to refuse to renew this policy or to increase the annual premium during the term of this policy.

The Company will mention in the cancellation or nonrenewal notice that the Insured has a right to request in writing within 30 days of the receipt of notice that the state's Insurance Director review the action of the Company.

Case ID: 210200529



**APPLICATION OF WIND DEDUCTIBLES**

If this policy includes a wind deductible containing:

**a.**   A percentage (%) applied against the value of insured property and/or the business interruption value; and

**b.**   A Minimum deductible amount;

The wind deductible will be calculated as shown in the example below.

**Example:**

The value of the insured property at the location where loss occurs is $100,000. The business interruption value is $100,000. A 2% deductible subject to a minimum deductible amount of $25,000 applies for this property.

**Step 1:**   Multiply the $100,000 value of the insured property by 2%. $100,000 X .02  = $2,000 property damage deductible.

**Step 2:**   Multiple the $100,000 Business Interruption value by 2%. ($100,000 X .02 = $2,000 business interruption deductible).

**Step 3:**   Add the deductible amounts calculated in steps 1 and 2. $2,000 Property Damage deductible + $2,000 business interruption deductible = $4,000 total wind deductible.

**Step 4:**   Determine if the deductible calculated in step 3 is less than or greater than the minimum amount stated deductible.

The $4,000 deductible is less than the minimum $25,000 deductible amount.  A $25,000 deductible amount applies in this example.

**If the above Application of Wind Deductibles clause applies, the following shall be applicable:**

THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR NAMED STORM OR WIND/HAIL LOSSES, WHICH MAY RESULT IN HIGH OUT-OF-POCKET EXPENSES TO YOU. THE ENCLOSED EXAMPLE ILLUSTRATES HOW THE DEDUCTIBLE MIGHT AFFECT YOU.

Case ID: 210200529



*Filed and Attested by the*
*Office of Judicial Records*
*05 FEB 2021 10:51 am*
*G. IMPERATO*

# Exhibit 2



Factory Mutual Insurance Company
3460 Preston Ridge Road, Suite 400
Alpharetta, GA 30005 USA
T: 770 777-3980   F: 770 777-3902
Mobile: 404 542-0690
Email: kathy.haviland@fmglobal.com

16-Apr-2020

Mr. Joseph A. Wacker, Esq.
General Counsel, Planet Fitness

| | |
|---|---|
| Reference: | Keystone PF Acquisition, LLC |
| Address: | 50 Greenfield Avenue, Ardmore, PA and other described locations throughout USA |
| Account No.: | IA202 |
| Date of Loss: | 16-Mar-2020 |
| Claim ID: | 500673 |
| Loss Description: | Shutdown due to Coronavirus (COVID-19) |

Dear Mr. Wacker,

On 16 March 2020, we received a loss notice from your broker, Mr. Joe McIntire with Lockton Companies, via email that reported business interruption to several gyms across Pennsylvania closed due to the potential spread of coronavirus (COVID-19).   We followed up with a telephone call to you thereafter to discuss further details.

From the loss notice and follow up telephone call, you confirmed the following:

- Due to confirmed cases of coronavirus in Pennsylvania, on 13 March 2020, Governor Tom Wolf imposed a shutdown in Montgomery County in an effort to quarantine the area due to the coronavirus (COVID-19). All schools, universities, gyms, entertainment venues, and community centers in Montgomery County were forced to close for a period of two weeks.

- The Governor followed up with shutdowns in Delaware County beginning 14 March 2020 and Bucks and Chester Counties beginning 15 March 2020.  All closures were imposed for a minimum of two weeks.

On 17 March 2020, we received a follow up email from Mr. McIntire in which we were advised that the City of Philadelphia shutdown the afore mentioned types of facilities effective 5:00 PM, 16 March 2020.  Governor Wolf also extended the shutdown to the entire Commonwealth of Pennsylvania effective 17 March 2020 until further notice, as the number of positive coronavirus cases continued to grow.

On 19 March 2020 we received an email from you advising the following:

- Due to the rapid increase of confirmed coronavirus cases, more emergency procedures were put into place in Delaware, South Carolina and North Carolina.  These measures directly affected gym locations within these states.

- Planet Fitness Corporate made a business decision to close all remaining corporate-owned locations as of 17 March 2020 until further notice.

Case ID: 210200529

Keystone PF Acquisition, LLC                                                                    16-Apr-2020

We followed this notice with a telephone call to you on 20 March 2020 to confirm receipt of the additional reported closures. During that call, you advised that there was an unconfirmed positive test for coronavirus at the Fort Mill, SC location; however, the gym had already closed for business at the time of notification.

Based on our inquiries during the 17 March 2020 and 20 March 2020 telephone discussions, you confirmed there was no physical damage, nor was there any evidence of the actual presence of COVID-19 at any of the reported locations at the time of closure.

Policy Coverage Position

Based on the information we have received and gathered during our investigation of this claim, our policy coverage analysis concludes that there is no policy liability under Keystone PF Acquisition, LLC's Policy No. IA202 ("Policy"), effective from 18 May 2019 to 18 May 2020, with Affiliated FM Insurance Company, for the reported disruption of Keystone's business operations, which may have resulted in business income loss and mitigation expenses.  Below we set forth some of the provisions relevant to our coverage determination and specify the reasons for the coverage denial.

Some of the Policy provisions relevant to the coverage analysis:

The Business Interruption section, on page 19, states

"**A.  LOSS INSURED**

This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:

1. To property described elsewhere in this Policy and not otherwise excluded by this Policy;

2. Used by the Insured;

3. While at a **location** or while in transit as provided by this Policy; and

4. During the Period of Liability as described elsewhere in this Policy."

The Policy states under C. **EXCLUSIONS** on Page 5:

"**GROUP III:** "This Policy excludes:

8. **Contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion does not apply to radioactive contamination which is excluded elsewhere in this Policy."

The Policy defines contamination under **DEFINITIONS** on Page 42:

"**contamination** means any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew"

Case ID: 210200529

Keystone PF Acquisition, LLC                                                              16-Apr-2020

Our understanding, based upon the information provided, is that Keystone's operations were shut down to comply with orders issued by provincial and city government officials due to the outbreak of COVID-19.

The trigger of coverage for Business Interruption loss, under the Policy, is physical loss or damage of the type insured. We have been advised that the locations did not sustain any physical loss or damage so that trigger is absent. In addition, if there was the presence of a virus, it is not of the type insured against as a virus falls within the definition of **contamination**, which is excluded.

The Policy does provide coverages under **BUSINESS INTERRUPTION COVERAGE EXTENSIONS**, which includes **Civil or Military Authority**, **Ingress/Egress, Protection and Preservation of Property – Business Interruption,** and **Supply Chain**. These coverages, however, would not apply because they also require physical loss or damage to property of the type insured to trigger coverage.

The Policy does provide coverage for **Communicable Disease** in both Property Damage and Business Interruption sections as set forth below. The Property Damage section, on page 7, states:

"**5. Communicable Disease – Property Damage**

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a) An order of an authorized governmental agency regulating or as result of such presence of **communicable disease**; or

b) A decision of an Officer of the Insured as a result of such presence of **communicable disease**,"

This Policy covers the reasonable and necessary costs incurred by the Insured at such **described location** for the:

a) Cleanup, removal and disposal of such presence of **communicable diseases** from insured property; and

b) Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of **communicable diseases** on insured property.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to such presence of **communicable disease**.

This coverage is subject to the Qualifying Period of 48 hours as described in the Declaration section of this Policy."

The Business Interruption section on page 25 states:

"**3. Communicable Disease – Business Interruption**

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a) An order of an authorized governmental agency regulating such presence of **communicable disease**; or

b) A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

Keystone PF Acquisition, LLC                                                                16-Apr-2020

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such **described location** with such presence of **communicable disease**.

This coverage is subject to the Qualifying Period of 48 hours as described in the Declaration section of this Policy.

Communicable Disease – Business Interruption Exclusions: As respects Communicable Disease – Business Interruption, the following additional exclusions apply:

This Policy does not insure loss resulting from:

a)  The enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

b)  Loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

a)  Starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but

b)  Not to exceed the time limit shown in the Limits of Liability clause in the Declarations section,

    This period of time is part of and not in addition to any Period of Liability applying to any coverage provided in the Business Interruption section."

The Policy defines communicable disease under **<u>DEFINITIONS</u>** on Page 42:

**"communicable disease** means disease which is:

1.  Transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

2.  Legionellosis.

COVID-19 does meet the Policy's definition of a "communicable disease." Yet for the "communicable disease" coverage to apply, under both the Property Damage and Business Interruption sections, the Policy requires the **"**actual not suspected presence" of a communicable disease at an insured location.  We have been advised by Keystone PF Acquisition, LLC that COVID-19 was not actually present at any locations. And access to the locations was not limited, restricted or prohibited by an order of civil authority or an officer of the company due to the actual presence of COVID-19 at any location. Consequently, no coverage is provided by the Policy under the **Communicable Disease – Property Damage** and **Communicable Disease – Business Interruption** additional coverages.

Based on the above, we find no liability under the terms and conditions of Affiliated FM Insurance Company Policy No. IA202 for the loss due to the forced closure of scheduled gym locations listed in the Policy.

Should you have any additional information that should be considered, please contact us within the next 30 days. We are willing to discuss the above provisions and our coverage determination. If we do not hear from you within this timeframe, we will assume you have no questions and will close our file.

Keystone PF Acquisition, LLC                                                                                    16-Apr-2020

The foregoing enumeration of specific provisions under the referenced Policy is not intended to waive any other defenses which are now, or may hereafter become available to Affiliated FM Insurance Company. The foregoing does not constitute a waiver of any terms or conditions of the referenced Policy or of any rights and

defenses under the referenced Policy and Affiliated FM Insurance Company hereby expressly reserves all of its rights and defenses thereunder.

Sincerely,

*Kathy Haviland*

Kathy Haviland
Senior Claims Examiner

Case ID: 210200529



Filed and Attested by the
Office of Judicial Records
05 FEB 2021 10:51 am
G. IMPERATO

# Exhibit 3



Kathy Haviland                                                                                    May 14, 2020
Senior Claims Examiner
Factory Mutual Insurance Company
3460 Preston Ridge Road, Suite 400
Alpharetta, GA 30005 USA
T : 770 777-3980 F : 770 777-3902

| | |
|---|---|
| **Insured:** | **Keystone PF Acquisition, LLC d/b/a National Fitness Partners ("NFP")** |
| **Insurer:** | **Affiliated FM Insurance Company ("FM")** |
| **Policy No.:** | **IA202 (the "Policy")** |
| **Policy Period:** | **May 18, 2019 – May 18, 2020** |
| **Claim ID:** | **500673** |
| **Loss Description:** | **COVID-19 Losses (the "Claim")** |

Dear Ms. Haviland:

This letter responds to your April 16, 2020 letter in which FM denied coverage for the above-referenced Claim.  In NFP's Policy, FM promised to insure property identified on the Location Schedule in the Declarations against "ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded."  As we discussed last month, NFP has incurred significant business interruption losses at all its insured locations due to the presence of COVID-19, and the ensuing shutdown orders that have been issued by governmental authorities around the country.  Further, the Policy does not contain any exclusions that would bar coverage for losses stemming from the spread of an infectious disease during a global pandemic. Therefore, I write to request that FM withdraw its wrongful denial of coverage and confirm coverage for the Claim under the Policy.

## I.      Business Interruption Coverage Section

FM contends that no coverage is available under the Business Interruption section of its Policy because it has concluded there has been no physical loss or damage at NFP's insured locations.  Specifically, FM alleges that NFP confirmed in telephone conversations that "there was no physical damage, nor was there any evidence of the actual presence of COVID-19 at any of the reported locations at the time of closure."  FM also states that "[w]e have been advised that the locations did not sustain any physical loss or damage so that trigger [of coverage] is absent."

To the contrary, no one from NFP ever stated that there was no physical damage or evidence of the actual presence of COVID-19 during our prior conversations.  Rather, I informed you during our phone conversation that despite the presence of COVID-19, workout equipment at NFP's locations remained operational, and there did not appear to be any structural damage to NFP's buildings.  However, I also made it very clear that due to the overwhelming presence of COVID-19, NFP was forced to close its premises, losing not only the use of its insured locations, but also the ability to derive revenue from the use of its property.  In sum, FM's entire letter is based on the faulty premise that NFP suffered no property loss, which is wholly inaccurate because we have lost the use of our property due to COVID-19.

Case ID: 210200529

Moreover, FM misstates the timeline relating to one of our customers who called and asked to cancel his membership at our Fort Mill, South Carolina location because he believed he had contracted COVID-19. NFP has been unable to confirm whether this customer tested positive for COVID-19, notwithstanding contacting the State of South Carolina and the South Carolina Department of Health, because the Health Insurance Portability and Accountability Act ("HIPAA") prevents sharing this customer's private medical information. FM's letter states that NFP received this notification after it had already closed its gyms. FM may be confused because NFP had closed the gym by the time you and I discussed this particular situation; however, the Fort Mill location was in fact still open at the time NFP received this notification from the customer. Indeed, the customer had worked out at the Fort Mill location the night before he called. This exemplifies the concern that necessitated NFP closing its insured locations: members who contracted COVID-19, including asymptomatic members who did not know they were contagious, would spread the disease at our properties unless NFP intervened and closed its gyms.

To the extent FM contends that the presence of COVID-19 does not constitute property loss or damage or is not the "type" of property damage insured under its Policy, court decisions around the country suggest otherwise. The policy does not mandate that property damage must consist of structural damage, and as we are sure FM is aware numerous court decisions around the country have held that property can sustain physical damage without experiencing structural alteration. For instance, Pennsylvania courts have explained that "physical loss or damage" occurs where the functionality of a property is eliminated or destroyed, or property is rendered useless or uninhabitable, which is exactly what has happened at our locations. Similar rulings in other jurisdictions have determined that the presence of intangible substances—such as gasoline vapors, ammonia, and pervasive odors—constitutes property loss or damage. The same logic applies here. The physical presence of COVID-19 when infected individuals enter our locations renders our insured locations useless and destroys their functionality. The Center for Disease Control ("CDC") has explained that COVID-19 can live on surfaces, such as workout equipment, for days and can also remain in the air within confined areas. Moreover, the Secretary of Pennsylvania's Department of Health has explained people can contract the disease by touching a surface or object that has the virus on it and then touching one's mouth, nose, or eyes. Thus, COVID-19's propensity to spread from physically impacted surfaces at our locations rendered the insured locations useless and non-functional. NFP's business interruption losses, therefore, arise as a direct result of physical loss or damage to its insured locations.

FM also suggests that the contamination exclusion bars coverage for business interruption losses arising from the presence of COVID-19. The contamination exclusion states that the Policy excludes "any cost due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy." But by its own terms, the exclusion only bars "costs" due to contamination; it does not bar business interruption losses, which are not "costs." Furthermore, the Policy defines "contamination" as "any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew." Although the word "virus" appears in the definition of "contamination," the Policy expressly grants coverage for losses arising from the presence of a communicable disease, which it defines as a disease which is "[t]ransmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges." FM admits that COVID-19 is a "communicable disease." Therefore, FM's interpretation of the definition of "contamination" and "communicable disease" cannot be reconciled, as it would lead to the Policy both expressly excluding and granting coverage for the presence of viruses. Because Pennsylvania interprets

Case ID: 210200529



exclusions narrowly and resolves ambiguities in favor of coverage, the contamination exclusion cannot bar coverage for loss arising from the presence of COVID-19.

Moreover, the contamination exclusion is not a broad virus and pandemic disease exclusion, as are found in many property policies. Instead, it effectively operates as a pollution exclusion, as evidenced by the fact that the contamination definition includes "pollutants," as well as other foreign substances and hazardous materials that are typically by-products of human-induced environmental pollution. The contamination exclusion, when compared to other broader exclusions available in the marketplace, does not reach losses resulting from naturally occurring infectious diseases spread by human contact. Instead, the "viruses" and "disease causing or illness causing agents" in the contamination exclusion refer to foreign substances and hazardous materials that can cause viruses or other diseases, such as contaminated food or water, medical waste, or chemical runoff. FM could have excluded coverage for COVID-19 related losses with an express infectious disease or pandemic disease exclusion, but it did not. Therefore, the contamination exclusion does not bar coverage for business interruption losses caused by the presence of COVID-19.

## II.    Civil Authority Coverage Section

The Policy also covers business interruption loss incurred "if an order of civil or military authority prohibits access to a location provided such order is the direct result of physical damage of the type insured at a location *or within five (5) statute miles of it*." FM purports to deny coverage under the Civil Authority Coverage Section because this coverage "also require[s] physical loss or damage to property of the type insured to trigger coverage." Setting aside whether there was physical loss or damage at NFP's insured locations, FM ignores that the physical damage prompting the civil authority order does not have to occur at an insured location. FM has not contended, and cannot credibly contend, that COVID-19 was not present within five miles of NFP's insured locations. Indeed, the Secretary of Pennsylvania's Department of Health expressed concern due to rapidly increasing case counts that "community spread" of COVID-19—where the illness is being transmitted through unknown sources, not from known areas of infection—was occurring. Similarly, the North Carolina Department of Health and Human Services expressed concern about the occurrence of widespread community transmission of the virus.

In response to this rapid spread of COVID-19, governmental authorities across the country began issuing orders requiring people to "shelter-in-place" and/or closing non-essential businesses, including gyms and fitness facilities. Pennsylvania issued an order that required NFP to close eight (8) locations in Montgomery County, Pennsylvania as of 12 a.m. on Friday, March 13, 2020. That weekend, new orders mandated the closure of NFP's six (6) locations in Delaware County, Pennsylvania as of 9 a.m. on Saturday, March 14, 2020, and another six (6) locations in Buck County, Pennsylvania as of 12 a.m. on Sunday, March 15, 2020. Each of those counties already had multiple confirmed cases of COVID-19, which prompted the governmental closure orders. In the following days, NFP was forced to close its remaining Pennsylvania locations when the City of Philadelphia issued an order requiring gyms to close by 5 p.m. on Monday, March 16, 2020—closing another fourteen (14) NFP locations—and then the Governor extended the shutdown from the select counties to the entire state, effective at 12 a.m. on Tuesday, March 17, 2020, which mandated closure of all of NFP's remaining fourteen (14) gyms in Pennsylvania.

As the COVID-19 pandemic fully swept the country, NFP closed all remaining locations as of 10 p.m. on Tuesday, March 17, 2020, which included three (3) locations in Delaware, twenty-four (24) locations in North Carolina, and two (2) locations in South Carolina. This matched the date and time that Planet Fitness Corporate closed all corporate-owned locations. By March 17, 2020, President Trump and

the CDC had issued guidelines warning people to avoid gatherings in groups of ten or more people, and the Governors of Delaware, North Carolina, and South Carolina had issued orders closing certain establishments and prohibiting large gatherings.  The Fire Marshall of Gaston County, North Carolina had specifically told a Planet Fitness location in his jurisdiction that if it did not close, he would force it to close.  Shortly thereafter, these states issued stay-at-home orders and mandated the closure of non-essential businesses—including gyms and fitness centers—effective March 24, 2020 (Delaware), March 30, 2020 (North Carolina), and April 7, 2020 (South Carolina).

These government mandated closures were the direct result of the spread of COVID-19, which, for the reasons discussed above, constitutes property damage.  Indeed, in Pennsylvania, the Governor acted pursuant to his authority during a declared disaster emergency.  Resulting litigation led the Pennsylvania Supreme Court to explain that the COVID-19 pandemic qualifies as a "natural disaster" under Pennsylvania's Emergency Code because, like the specific disasters referenced in the definition of "natural disaster" of the code—e.g., hurricane, tornado, explosion—they all involve substantial *damage to property*, hardship, suffering, or possible loss of life.  Likewise, North Carolina's Governor issued a statewide order to supersede the numerous local orders already in effect because he determined that local control of the emergency is insufficient *to assure adequate protection for lives and property* of North Carolinians.  The Delaware and South Carolina orders, too, state that they were enacted to protect *life and property* within the states.  It is clear, then, that the civil authority orders that prohibit access to the insured locations are the direct result of physical damage within five miles of the insured locations.

FM's letter does not specify whether it contends that the contamination exclusion bars coverage under the Civil Authority Coverage Section.  To the extent FM takes such a position, the contamination exclusion is inapplicable.  Indeed, the contamination exclusion does not apply to the Civil Authority Coverage Section for the same reasons it does not apply to the Business Interruption Coverage Section: (1) the application of the exclusion to COVID-19 cannot be reconciled with the Policy's grant of coverage for communicable diseases, and (2) the exclusion is effectively a pollution exclusion, not a broad virus or pandemic disease exclusion.  Further, the contamination exclusion does not apply to the Civil Authority Coverage Section on its face.  Many similar types of exclusions in other property policies explicitly state that they bar coverage for interruptions by civil authority.  But the contamination exclusion at issue here does not reference civil authority.  And even if the presence of COVID-19 at the insured locations fell within the contamination exclusion (it does not), to the extent the governmental orders and the presence of COVID-19 are concurrent causes of the loss, the contamination exclusion does not appear among the Group I exclusions in the Policy that contain anti-concurrent causation language such as the exclusion for radioactive contamination ("Group I: This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss or damage").  Therefore, if the contamination exclusion would otherwise apply to NFP's losses but there is another covered cause of the losses—here, the governmental orders due to the presence of COVID-19 within five miles of the insured locations—NFP would still be entitled to coverage under the Civil Authority Coverage Section.

## III.   Communicable Disease Coverage Section

FM also denied coverage under the Communicable Disease Coverage Section.  This section provides coverage for business interruption loss incurred if an insured location "has the actual not suspected presence of communicable disease and access to such described location is limited, restricted or prohibited by: a) An order of an authorized governmental agency regulating such presence of communicable disease; or b) A decision of an Officer of the Insured as a result of such presence of communicable disease."  FM

DMSLIBRARY01\10396\253018\36879112.v1-5/11/20



conceded that COVID-19 meets the Policy's definition of "communicable disease," but denied coverage because COVID-19 was allegedly not present at any insured location and access to the insured locations was allegedly not limited, restricted, or prohibited by an order of civil authority or an officer of the company due to the actual presence of COVID-19. NFP disagrees for reasons outlined above and notes that FM raised no other exclusions as potential barriers to coverage.

*     *     *

NFP looks forward to FM's response and reiterates its request that FM accept coverage for all of the business interruption losses NFP has incurred and continues to incur during the COVID-19 pandemic. After FM withdraws its coverage denial, we will look forward to documenting the amount of our loss and discussing the possibility of interim payments under the Policy while we work together to adjust the Claim. To this end, please confirm that FM will suspend the 90-day deadline for submitting NFP's proof of loss under Section I.4. of the Policy until after FM has withdrawn its coverage denial. Please contact me if you have further questions. In the meantime, NFP reserves all rights under the policy, in equity, and at law.

Very Truly Yours,

JOSEPH A. WACKER, ESQUIRE
GENERAL COUNSEL
PLANET FITNESS
400 S. State Road
Suite 200
Springfield, PA. 19064
P: (908)334-0243
jwacker@natfitnesspartners.com

cc:    Joe McIntire (JMcIntire@lockton.com)
       Jackson Brumlow (JBrumlow@lockton.com)



*Filed and Attested by the
Office of Judicial Records
05 FEB 2021 10:51 am
G. IMPERATO*

# Exhibit 4

Case ID: 210200529



Affiliated FM Insurance Company
3460 Preston Ridge Road, Suite 400
Alpharetta, GA 30005 USA
T: 770 777-3980   F: 770 777-3902
Mobile: 404 542-0690
Email: kathy.haviland@fmglobal.com

June 30, 2020

Joe Wacker, General Counsel
Keystone PF Acquisition, LLC

Insured:  Keystone PF Acquisition, LLC d/b/a National Fitness Partners (NFP)
Loss Address:  Various Locations
Policy No:  IA202
Date of Loss:  13-Mar-2020
Peril: Communicable Disease
Claim ID: 500673

Dear Mr. Wacker,

This letter is in response to your May 15, 2020 letter to us refuting our denial of coverage for the above referenced loss.  Per your letter, NFP contends that significant business interruption has been incurred at all its insured locations due to the presence of COVID-19 and the ensuing shutdown orders that have been issued by governmental authorities around the country.

Your Policy provides coverage for "communicable disease" under both the Property Damage and Business Interruption sections as described in our coverage position. However, the Policy requires the "actual not suspected presence" of a communicable disease **at an insured location**. Based on the information received, no evidence has been provided that demonstrates the novel coronavirus, which causes COVID-19,[1] was actually present at your locations. Therefore, the threshold requirement for coverage is absent.

**Coverage**

The Policy's Property Damage section includes coverage for "Additional Coverages." Page 7 states, in relevant part:

   5. **Communicable Disease – Property Damage**

      If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

      a) An order of an authorized governmental agency regulating or as result of such presence of **communicable disease**; or

      b) A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

      This Policy covers the reasonable and necessary costs incurred by the Insured at such **described location** for the:

      a) Cleanup, removal and disposal of such presence of **communicable disease** from insured property; and

      b) Actual costs or fees payable to public relations services or actual costs of using the Insured's employees

---

[1]   According to the World Health Organization, COVID-19 is the official name of the disease caused by the novel coronavirus (SARS-CoV-2). In this letter, we use the term COVID-19 generally to apply to both the novel coronavirus and the disease.

Case ID: 210200529

for reputation management resulting from such presence of **communicable disease** on insured property.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to such presence of **communicable disease**.

This coverage is subject to the Qualifying Period of 48 hours as stated in the Declarations section of this Policy.

The Policy's Business Interruption section also includes coverage for "Business Interruption Coverage Extension." Page 25 states, in relevant part:

    **3.** **Communicable Disease – Business Interruption**

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

    **a)** An order of an authorized governmental agency regulating such presence of **communicable disease**; or

    **b)** A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such **described location** with such presence of **communicable disease**.

This coverage is subject to the Qualifying Period of 48 hours as stated in the Declarations section of this Policy.

The Policy defines "communicable disease" on page 42 as follows:

**communicable disease** means a disease which is:

    **1.** Transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges…

COVID-19 is a communicable disease. The Policy's communicable disease coverage provisions, however, require the "actual not suspected presence" of COVID-19 at a described location owned, leased or rented by you.

As discussed above, COVID-19 was not actually present at a described location owned, leased or rented by you. Without the actual presence of a communicable disease at the location, this coverage does not apply. Consequently, no coverage is provided by the Policy under **Communicable Disease- Property Damage** or **Communicable Disease – Business Interruption**.

In addition to these coverages, we analyzed your loss under other Policy provisions. We understand that your operations were shut down to comply with orders issued by government officials due to concerns about the spread of COVID-19.

The Policy responds to all risks of physical loss or damage, except as excluded, and subject to the Policy's terms and conditions. Therefore, except as provided by Policy extensions that specifically extend coverage for non-physical damage, you must sustain actual physical loss or damage of the type insured to property of the type insured for the Policy's coverages to respond.

The Policy's Business Interruption Section, on page 19, states, in relevant part:

    **A.** **LOSS INSURED**

This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured.

    **1.** To property as described elsewhere in this Policy and not otherwise excluded by this Policy;

    **2.** Used by the Insured;

    **3.** While at a location or while in transit as provided by this Policy; and

Case ID: 210200529

4.   During the Period of Liability as described elsewhere in this Policy.

Under the Policy, Business Interruption loss must directly result from physical loss or damage of the type insured. Because the location did not sustain any physical loss or damage, this threshold Policy requirement is absent. The presence of COVID-19, even if established, would not constitute "physical loss or damage," and it would be excluded as "contamination" as discussed further below.

This same analysis applies to the Policy's Business Interruption Coverage Extensions, such as the Civil or Military Authority provision, quoted below:

**2.  Civil or Military Authority**

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

The Period of Liability for this Business Interruption Coverage Extension will be:

**a)**   The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy.

This coverage requires the civil authority order to be "the direct result of physical damage of the type insured at a location or within five statute miles of it." Based on our investigation, there is no evidence of physical damage of the type insured at the insured location or within five statute miles of it.

Moreover, the Policy specifically excludes contamination, which applies to COVID-19. Pages 2 and 3 state, in relevant part:

**C.  EXCLUSIONS**

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

* * *

**GROUP III:** This Policy excludes:

* * *

**8.**   **Contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion does not apply to radioactive contamination which is excluded elsewhere in this Policy.

The Policy defines "contaminant" and "contamination" on page 42 as:

**contaminant** means anything that causes **contamination**.

**contamination** means any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

Because COVID-19 is a virus, pathogen and/or disease causing or illness causing agent, it constitutes contamination which is excluded under the Policy. The only coverage potentially available, therefore, for any claim arising out of COVID-19 is provided by the Policy under **Communicable Disease – Property Damage** or **Communicable Disease – Business Interruption**. Here, as discussed, these coverages are not applicable because there is no evidence that the virus was actually present at a described location owned, leased or rented by you.

Finally, the Policy's Business Interruption Exclusions preclude business interruption loss for any reason other than physical loss or damage insured under the Policy. Page 48 of the Policy provides, in relevant part:

Case ID: 210200529

**D.  BUSINESS INTERRUPTION EXCLUSIONS**

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Business Interruption loss:

This Policy does not insure:

A.  Any loss during any idle period, including but not limited to when production, operations or services or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

    **a)**  Physical loss or damage not insured by this Policy.

    **b)**  Planned or rescheduled shutdown.

    **c)**  Strikes or other work stoppage.

    **d)**  Any other reason other than physical loss or damage insured under this Policy.

Because COVID-19 does not constitute "physical loss or damage insured under this Policy" as required under this provision, Business Interruption loss due to COVID-19 would also be considered an "idle period".

## Conclusion

Based on the above and the information provided to date, we still find no liability under the term and conditions of AFM's Policy No. IA202 for the loss due to the shutdown of NFP locations.

Should something change or if you have additional information that would impact your coverage analysis, please contact us and provide the following information which will allow us to re-open our investigation:

1.  Please identify each location owned, leased or rented by NFP which had the actual not suspected presence of COVID-19.

2.  How did you determine that the location(s) identified above had the actual presence of COVID-19?

3.  Have the identified location(s) been tested for COVID-19? If yes, please provide copies of the test reports.

4.  Have the location(s) been cleaned due to the presence of COVID-19? If yes, please provide copies of contractor invoices and service report(s), cleanup, removal or disposal costs incurred and any documents confirming that the location was cleaned.

5.  Have any employees (including outside workers, sub-contractors, etc.) and others who were in the location(s) been tested for COVID-19? Please answer only "yes" or "no."

6.  Have any of these individuals tested positive for COVID-19? Please answer only "yes" or "no."

7.  Please request and provide the employee's or other person's test results (with all personal identifying information redacted).

8.  For each employee who tested positive, please provide the date of the employee's positive test result.

9.  For each employee who tested positive, please provide support to establish when the employee was present at the location(s). This may include, but is not limited to, information such as payroll records and building entry data. Please redact identifying personal information of the employee(s) if required.

10. For each employee who tested positive, please provide information as to when the employee first exhibited symptoms of COVID-19.  Symptoms may include, but are not limited to: fever of 100.4 F or higher; a new persistent cough; chest pain; and/or shortness of breath.

11. Have you contacted or been contacted by any local, state, or federal agency (e.g. local/state Department of Health, CDC, etc.) regarding COVID-19 test results of your employees? If yes, please provide those communications.  If the communications contain any personal private information of employees, please forward a redacted copy of the communications.

Case ID: 210200529

12. Please provide a copy of any and all such orders by an authorized governmental agency or an Officer of NFP limiting, restricting or prohibiting access to locations.

Please provide this information and any other information you believe may be relevant to the loss as soon as you are able. This list is not intended to be all inclusive and additional requests for information may be necessary.  If we do not hear from you within 30 days, we will assume you have no further questions or additional information to provide and will close our file.


Sincerely,

*Kathy Haviland*

Senior Claims Examiner



Filed and Attested by the
Office of Judicial Records
05 FEB 2021 10:51 am
G. IMPERATO

# Exhibit 5

Case ID: 210200529

Talking Points on the 2019 Novel Coronavirus (2019-nCoV)

"2019 Novel Coronavirus (2019-nCoV) is a virus (more specifically, a coronavirus) identified as the cause of an outbreak of respiratory illness first detected in Wuhan, China. Early on, many of the patients in the outbreak in Wuhan, China reportedly had some link to a large seafood and animal market, suggesting animal-to-person spread. However, a growing number of patients reportedly have not had exposure to animal markets, indicating person-to-person spread is occurring. At this time, it's unclear how easily or sustainably this virus is spreading between people.  The latest situation summary updates are available on CDC's web page 2019 Novel Coronavirus, Wuhan, China."[1]

Several of our clients have inquired as to whether there is coverage for losses they have or expect to incur as a result of the virus, which has spread outside of China. As one might expect, we have a wide range of clients who may be affected in a variety of ways by this outbreak. This document will not deal with all the issues associated with this matter, but will be helpful in providing responses to basic questions as it relates to the coverage provided by our policies.

The standard FM Global Advantage and AFM proVision forms provide a specific coverage for Communicable Disease. The Advantage policy provides Communicable Disease Response under Property Damage and Interruption by Communicable Disease under Time Element. The proVision policy provides coverage for Communicable Disease – Property Damage and Communicable Disease – Business Interruption. This memo addresses the standard policy language (cited below).

**Lead in policy language policy language is noted below:**
Property Damage
    The 2019Advantage Policy states in part:
        If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such location is limited, restricted or prohibited by:
        1) an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or
        2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

    The proVision states:
        If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:
        **a)** An order of an authorized governmental agency regulating or as result of such presence of **communicable disease**; or
        **b)** A decision of an Officer of the Insured as a result of such presence of **communicable disease**

This same initial lead in language also appears under the Advantage Time Element coverage and the proVision Business Interruption coverage.

Q. What is the trigger of coverage for Property Damage?

    A. Under each policy there must be the actual presence of a **communicable disease** at a location owned, leased or rented by the Insured and the access must be limited by either 1) or 2) under the Advantage, or a) or b) under proVision

Q. When does this coverage apply?

    A.   Advantage Policy – under both Property Damage and Time Element each state:
        • This Additional Coverage will apply when access to such location is limited, restricted or prohibited in excess of 48 hours
    A.   AFM proVision Policy - under both Property Damage and Business Interruption each state:
        • This coverage is subject to the Qualifying Period in the Declarations section of this Policy

Q. Would an employee at a **location** who is affected with the **communicable disease** be considered the "actual presence" of a **communicable disease?**

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/about/index.html

Case ID: 210200529
P 0072

A. Yes - if it can be confirmed the employee actually has the **communicable disease** and that the presence of the **communicable disease** is the basis for the decision limiting access as noted in sub-sections 1) and 2) under the Advantage Policy or a) and b) under proVision Policy.

Q. How can we determine whether an employee has the **communicable disease**

A. In some jurisdictions, access to medical records is not possible without employee consent. However, the Insured can ask the employee for the necessary medical diagnosis.

Q. If an Insured closes one or more locations because they suspect the presence of the **communicable disease** or does so in an abundance of caution, would that trigger coverage.

A. No. Coverage is only triggered if there is the actual presence of a **communicable disease.**

Q. What deductible would apply in the event of a covered loss?

A. If a coverage-specific deductible is not specified, the largest applicable deductible would apply. For example, if the location deductible is $1,000,000 combined and the All Other Loss deductible is $250,000, the $1,000,000 would apply.

Q. Would an outbreak of a different virus be considered part of the same occurrence?

A. No

Q. Does coverage under Civil or Military Authority apply?

A. No
The Advantage form states:
"This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to the insured location provided such order is the direct result of physical damage of the type insured at the insured location or within five statute miles/eight kilometres of it…."

The proVision form states:
"This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it…"

A virus will typically not cause physical damage. Under either policy, the presence of a communicable disease does not constitute physical damage and is not of the type insured against as a virus falls within the definition of **contamination,** which is excluded.

Q. Does coverage under Contingent Time Element Extended (Advantage) or Supply Chain (ProVision) or Ingress/Egress apply?

A. No
These coverages require physical loss or damage to property of the type insured under either policy. The presence of a communicable disease does not constitute physical damage and is not of the type insured against as a virus falls within the definition of **contamination,** which is excluded.

Q. Is there any activity to consider prior to confirming coverage or issuing a payment?

A. Yes - keep in mind that most policies issued have a specific limit for this coverage and an annual aggregate applies. Check with the Claims Manager Written as well as the DSGA Written prior to confirming coverage and prior to issuing any payment to determine the status of the annual aggregate.

While the FM Global Advantage offers some of the broadest property coverage available, there are still events for which there may be no coverage. The Advantage and AFM policies insure against physical damage and require that there be insured physical loss or damage to property before its coverages become available. The Communicable Disease coverage provides for a specific trigger of coverage under these Additional Coverages. If there is a report of loss, FM Global stands ready to provide all the coverage available under the terms and conditions of its policies.

Case ID: 210200529
P-0073

# COMMERCE PROGRAM ADDENDUM
## TO CIVIL COVER SHEET

This case is subject to the Commerce Program because it is not an arbitration matter and it falls within one or more of the following types (check all applicable):

_____   1.   Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g., Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;

_____   2.   Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:

       _____   a.   Uniform Commercial Code transactions;

       _____   b.   Purchases or sales of business or the assets of businesses;

       _____   c.   Sales of goods or services by or to business enterprises;

       _____   d.   Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;

       _____   e.   Surety bonds;

       _____   f.   Purchases or sales or leases of, or security interests in, commercial, real or personal property; and

       _____   g.   Franchisor/franchisee relationships.

_____   3.   Actions relating to trade secret or non-compete agreements;

_____   4.   "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;

_____   5.   Actions relating to intellectual property disputes;

_____   6.   Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;

_____   7.   Derivative actions and class actions based on claims otherwise falling within these ten types, such as shareholder class actions, but not including consumer class actions, personal injury class actions, and products liability class actions;

_____   8.   Actions relating to corporate trust affairs;

__X__   9.   Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Comprehensive General Liability policy;

_____   10.   Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.